**Slip Op. 04-114**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| _____ : | | |
| AL TECH SPECIALTY STEEL CORP., CARPENTER | | |
| TECHNOLOGY CORP., REPUBLIC ENGINEERED : | | |
| STEELS, TALLEY METALS TECHNOLOGY, INC. | | |
| and UNITED STEEL WORKERS OF AMERICA, : | | |
| AFL-CIO/CLC, | | |
| : | | |
| *Plaintiffs,* | | |
| : | | |
| v. | | |
| : | | |
| UNITED STATES OF AMERICA, | | |
| : | | |
| *Defendant.* | | |
| _____ : | Consol. Court No. 98-10-03061 | |
| ACCIAIERIE VALBRUNA S.R.L. and : | | |
| ACCIAIERIE DI BOLZANO S.P.A., | | |
| : | | |
| *Plaintiffs,* | | |
| : | | |
| v. | | |
| : | | |
| UNITED STATES OF AMERICA, | | |
| : | | |
| *Defendant.* | | |
| _____: | | |

[U.S. Department of Commerce's countervailing duty determination is remanded for further action consistent with this opinion.]

Decided: September 8, 2004

Collier Shannon Scott, PLLC (David A. Hartquist, Laurence J. Lasoff, Robin H. Gilbert, R. Alan Luberda, Lynn Duffy Maloney and John M. Herrmann), for Plaintiffs/Defendant-Intervenors AL Tech Specialty Steel Corporation *et al.*

        White & Case LLP (Walter J. Spak, Gregory J. Spak, Christopher M. Curran, Richard J. Burke and Lynn H. Fabrizio), for Plaintiffs/Defendant-Intervenors Acciaierie Valbruna S.r.l. *et al*.

        Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini and Aileen M. Bell); Peter G. Kirchgraber, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant United States.

**OPINION**

RIDGWAY, Judge:

        In this consolidated action, the U.S. Department of Commerce ("Commerce") is taking flak from both sides. Both the domestic parties (hereinafter collectively "AL Tech")[1] and two Italian producers and exporters of stainless steel wire rod are contesting various aspects of the agency's Final Determination which found that the Government of Italy, the Province of Bolzano, and the European Union ("EU") provided countervailable subsidies to the two Italian producers – Acciaierie Valbruna S.r.l. ("Valbruna") and Acciaierie di Bolzano S.p.A. ("Bolzano") (hereinafter collectively "Valbruna/Bolzano"),[2] and which resulted in the imposition of a countervailing duty order.[3] *See*

---

[1]The domestic parties – AL Tech Specialty Steel Corp., Carpenter Technology Corp., Republic Engineered Steels, Talley Metals Technology, Inc., and the United Steelworkers of America, AFL-CIO/CLC – are Plaintiffs in the first of the two consolidated actions, as well as Defendant-Intervenors in the second.

[2]Valbruna and Bolzano are Defendant-Intervenors in the first of the two consolidated actions, as well as Plaintiffs in the second.

[3]Commerce may impose countervailing duties where it determines that a government or public entity within a country is providing a countervailable subsidy (*i.e.*, a financial contribution that confers a benefit on the recipient), which may take the form of, *inter alia*, grants, loans, goods or services, as well as less tangible forms (such as the foregoing of revenue – *e.g.* rent or taxes – that would otherwise be due. 19 U.S.C. § § 1671(a), 1677(5). In order for a subsidy to be countervailable it must be "specific" – that is, it must not be generally available. A subsidy may be

Certain Stainless Steel Wire Rod from Italy, 63 Fed. Reg. 40,474 (Dep't Commerce July 29, 1998)

("Final Determination"); Stainless Steel Wire Rod from Italy, 63 Fed. Reg. 49,334 (Dep't Commerce

Sept.15, 1998) (countervailing duty order).

Predictably, AL Tech challenges the subsidy rate in the countervailing duty order as too low,

while Valbruna/Bolzano challenges it as too high. Indeed, Valbruna/Bolzano observes that – under

U.S. law – Commerce can make an affirmative determination in a countervailing duty case (and issue

a countervailing duty order) only if the aggregate net countervailable subsidy equals or exceeds one

percent *ad valorem*. In this case, Commerce identified 10 types of government action considered

to confer "subsidies," then summed up the asserted benefits of those actions and calculated a subsidy

rate of 1.28% – a rate only marginally above the statutory "*de minimis*" one percent threshold.[4]

Valbruna/Bolzano emphasizes that it here challenges Commerce's determinations as to six

of the 10 alleged subsidies – and that its success in *even a single one* of those six challenges[5] may

---

deemed specific if its availability is limited to, for example, certain enterprises, certain industries, or certain geographical regions. 19 U.S.C. § 1677(5A). Where the availability of a subsidy is limited expressly by legislation or by the subsidy- granting authority, the subsidy may be considered specific as a matter of law (*de jure*). Where, for example, the actual number of recipients is limited, or where a particular enterprise or industry is a predominant user of a subsidy, the subsidy may be considered specific as a matter of fact (*de facto*). 19 U.S.C. § 1677 (5A)(D).

[4]That figure stands in stark contrast to the subsidy rate of 22.2% calculated by Commerce for the third Italian steel producer under investigation, Cogne Accai Speciali. *See* Final Determination, 63 Fed. Reg. at 40,503. *See also* 63 Fed. Reg. at 49,334 (countervailing duty order).

[5]Each of Valbruna/Bolzano's six challenges concerns a different subsidy rate: (1) lease for less than adequate remuneration (0.16%); (2) two-year rent abatement (0.38%); (3) Law 25/81 grants to Bolzano (0.28%); (4) Law 193/84 capacity reduction payments to Falck (0.04%); (5) Law 193/84 capacity reduction payments to Valbruna (0.10%); and (6) European Social Fund (0.05%). Thus, Valbruna/Bolzano's success on as few as  one of its challenges (*e.g.*, the two-year rent abatement subsidy or the unrounded calculations with the Law 25/81 grants subsidy), or on various combinations of its challenges, could drop the subsidy rate below the one percent *de minimis*

shave off enough so that the subsidy rate falls below the *de minimis* threshold, and the countervailing

duty order would be, in essence, void *ab initio*.[6]

Valbruna/Bolzano further asserts that this case is not only an *easy* case (in the sense that

Valbruna/Bolzano need prevail on only a bare handful of its many arguments to achieve all the relief

that it seeks), but that it is a *rare* case as well – because, according to Valbruna/Bolzano, neither the

Italian Government nor the Province of Bolzano provided significant benefits that directly affected

Valbruna/Bolzano's exports of stainless steel wire rod. Instead, "most of the subsidies found to exist

(0.86 percent of the total 1.28 percent) related either to benefits provided to a previous owner of

---

threshold. *See* Memorandum of Points and Authorities in Support of Valbruna/Bolzano's Motion for Judgment on the Agency Record ("Valbruna Brief") at 3; Reply of Plaintiffs/Defendant-Intervenors Valbruna/Bolzano in Support of Their Motion for Judgment on the Agency Record Pursuant to Rule 56.2 ("Valbruna Reply Brief") at 1, 36-37 (explaining that the unrounded total subsidy is 1.263801% and that the unrounded portion of the total subsidy attributed to Law 25/81 grants is 0.275512%, and noting that a finding in Valbruna/Bolzano's favor on the Law 25/81 issue alone would make the subsidy *de minimis*).

[6]Indeed, Commerce recently published notice of its revocation of the countervailing duty order at issue, effective retroactively to September 15, 2003, based on the agency's determination that revocation of the order is not "likely to lead to continuation or recurrence of a countervailable subsidy" – *i.e.*, that any future "net countervailable subsidy likely to prevail is *de minimis*." *See* Stainless Steel Wire Rod from Italy, 69 Fed. Reg. 40,354 (Dep't Commerce July 2, 2004). However, Commerce's recent action does not moot this case.

Entries of the subject merchandise from Valbruna/Bolzano were subject to Commerce's countervailing duty order and the 1.28% countervailing duty deposit from the publication date of the agency's affirmative Preliminary Determination until October 15, 2002 (when Commerce calculated the countervailing duty rate to be *de minimis*). *See* Stainless Steel Wire Rod from Italy, 67 Fed. Reg. 63,619 (Dep't Commerce Oct. 15, 2002). Thus, at issue in this action is the rate at which countervailing duties are to be finally assessed on those entries of merchandise for which Valbruna/Bolzano was required to deposit duties. Valbruna/Bolzano here asserts that, because any subsidy was *de minimis*, that rate should be zero, and that it is therefore entitled to recover its deposits on those entries (with interest).

Bolzano,[7] or to a real estate agreement through which Valbruna leased the land and buildings associated with the industrial facilities from the Province of Bolzano." *See* Valbruna Brief at 4; *see also id.* at 9 ("most of the 1.28 percent . . . related to two commercial transactions not directly related to the production or sale of Italian stainless steel wire rod").

Like Valbruna/Bolzano, AL Tech too disputes various aspects of Commerce's determination concerning the adequacy of Valbruna's rent under its lease with the Province of Bolzano. But, unlike Valbruna/Bolzano, AL Tech contends that the overall calculated subsidy rate should be higher number. AL Tech otherwise mounts a vigorous defense of Commerce's Final Determination. For its part, the Government maintains that both parties' challenges are lacking in merit, and that Commerce's Final Determination should be sustained in all respects.

---

[7]One of Valbruna/Bolzano's arguments challenging Commerce's determinations on assistance provided under Laws 25/81 and 193/84 is not presently before the Court. That argument concerns Commerce's finding that certain subsidies to Falck and Bolzano passed through to Valbruna/Bolzano when Valbruna purchased Bolzano from Falck. Specifically, Valbruna/Bolzano contends that Commerce erred by applying its methodology for privatization transactions (*i.e.*, sales of *public* entities to *private* entities) to the purchase of a *private* company (Bolzano) by a *private* entity (Valbruna) from another *private* entity (Falck). That privatization/change-in-ownership subsidy pass-through issue has been previously remanded to Commerce, and – at the request of all parties – is presently stayed.

Commerce decided the subsidy pass-through issue in this case under its old "gamma" methodology, now discredited. Since that time, in response to rulings by the U.S. Court of Appeals for the Federal Circuit and the World Trade Organization, Commerce has changed its methodology several times. *See* Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act, 68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003). However, Commerce has not yet re-analyzed the subsidy pass-through issue in this case. If Valbruna/Bolzano prevails on other arguments it has raised in this action, the level of subsidy may fall below the statutory *de minimis* level, obviating the need for Commerce to re-analyze the pass-through issue here using a revised methodology.

Jurisdiction is predicated on 28 U.S.C. § 1581(c) (1994).[8]  In a matter such as this, Commerce's determination must be sustained, except to the extent that it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

Pending before the Court are two motions for judgment on the agency record, filed by AL Tech and Valbruna/Bolzano, respectively.  For the reasons set forth below, AL Tech's motion is denied, Valbruna/Bolzano's motion is granted, and this action is remanded to Commerce for further proceedings consistent with this opinion.[9]

## I.  Background

The picturesque northern-most region of Italy – the Province of Bolzano – provides the backdrop for the three interrelated commercial transactions and the three government programs that underlie this action.

Most of the 1.28% subsidy rate calculated by Commerce relates to the three interrelated commercial transactions involving the production facilities of Acciaierie di Bolzano S.p.A. ("Bolzano") – a manufacturer of stainless steel wire rod which was until 1995 a virtually wholly-owned subsidiary of Falck (a private corporate group that historically had holdings in steel, real estate, environmental technologies, and other sectors).  *See* Prop. Doc. No. 6 at 8; Prop. Doc. No.

---

[8]All statutory citations are to the 1994 version of the U.S. Code.  However, the pertinent text of the cited provisions remained the same at all times relevant herein.

[9]However, a decision on Valbruna/Bolzano's challenge to Commerce's pass-through methodology is expressly reserved.  As explained in note 7 above, that issue is presently on remand to the agency, and the remand is stayed.

9, App. F-1; Prop. Doc. No. 9, App. F-3; Prop. Doc. No. 25, App. 9.[10]  Also participating in these transactions were the Province of Bolzano and Acciaierie di Valbruna ("Valbruna"), another steel manufacturer.  *See* Pub. Doc. No. 98 at 4.

Over a period of years Falck, Bolzano, and Valbruna received financial assistance under several programs funded by the European Union, the Government of Italy, and the Province of Bolzano, including (1) Provincial Law 25/81, which provided funds for restructuring; (2) Law 193/84, which provided funds for steel-capacity reduction; and (3) the European Social Fund, which funded training for workers at risk of unemployment.  *See* Prop. Doc. No. 9 at 10-11; Pub. Doc. No 220 at 5, 9; Pub. Doc. 221 at 6-8.

In early 1994, Falck informed the Province of its intent to shut down Bolzano's steel-making operations and sell the site on which Bolzano was operating (the "Industrial Site").  *See* Prop. Doc. No. 51 at 3-5; Pub. Doc. No. 65 at 15-16; Pub. Doc. No. 218 at 5-6.  In recent years, the Province had been acquiring industrial property within its borders, as part of an effort to preserve jobs within the region.  The Province began negotiating with Falck to purchase of the land and buildings comprising the Industrial Site.  *See* Pub. Doc. No. 218 at 5-6.

The Provincial Cadastral Office undertook an appraisal of the Industrial Site, including the two separate tracts that made up the Industrial Site – the Stabilimento Sede and the Stabilimento Erre

---

[10]The administrative record in this case consists of two sections, designated "Public" and "Proprietary," respectively.  The "Public" section consists of copies of all documents in the record of this action, with all confidential information redacted.  The "Business Proprietary" section consists of complete, unredacted copies of only those documents that include confidential information.  Citations to documents in the "Public" section of the administrative record are noted as "Pub. Doc. No."  Citations to documents in the "Proprietary" section are noted as "Prop. Doc. No."  All page numbers refer to the original, internal pagination of the documents.

(nominally owned, respectively, by Bolzano and another Falck subsidiary).[11]  Pub. Doc. No. 218 at 5-7; Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6; Prop. Doc. No. 9 at 4.  In their appraisal, Cadastral officials considered the taxable value of the Industrial Site, and compared the prices paid for other large industrial properties in the area.  The appraisal also accounted for relevant factors such as the demolition of existing structures, the need for environmental remediation, and the availability of industrial property in the Province.  The appraisal expressly disclaimed any consideration of "the economic and social importance" of the property.  *See generally* Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6 at 4-7; Pub. Doc. No. 218 at 7.

As it was negotiating an agreement (the "Site Purchase Agreement") to sell the Industrial Site to the Province, Falck interested Valbruna in buying Bolzano, Falck's steelmaking subsidiary.  *See* Pub. Doc. No. 218 at 5.  Valbruna wanted to increase its steel manufacturing operations and, in late 1994, began negotiations for an agreement to purchase Falck's 99.99% equity holding in Bolzano (the "Share Transfer Agreement").  *See* Prop. Doc. No. 9 at 15-16; Pub. Doc. No. 98 at 4.  Knowing of Falck's negotiations with the Province for the sale of the Industrial Site, Valbruna conditioned its

---

[11]As the Government notes, the Provincial Cadastral Office is the official authority responsible for the assessment of property within the jurisdiction of the Province. *See* Defendant's Memorandum in Opposition to Plaintiffs' Motions for Judgment on the Agency Record ("Gov't Response Brief") at 39 & n.9 ("According to Webster's II, New Riverside University Dictionary (1988), 'cadaster' means 'A public record, survey, or map of the value, extent, and ownership of land as a basis of taxation,' and lists 'cadastral' as the adjectival form.").

As the official governmental authority responsible for the appraisal of property within the jurisdiction, the actions and determinations of the Cadastral Office are subject to administrative checks and balances, including the appeal of its appraisals to the courts. *See generally* Memorandum of Plaintiffs/Defendant-Intervenors Valbruna/Bolzano in Response to Brief in Support of Plaintiffs' Motion for Judgment on the Agency Record Pursuant to Rule 56.2 (incorporating replacement pages filed on August 30, 1999) ("Valbruna Response") Brief at 13.

proposed purchase of Bolzano on its ability to lease the Industrial Site from the Province.  *See* Prop. Doc. No. 22 at 5.

Soon after talks between Valbruna and Falck began, Valbruna commissioned an independent appraisal of the Industrial Site and negotiated an agreement with the Province for the lease of the property (the "Lease Agreement").  Under the Lease Agreement, Valbruna's rent was specified as a percentage of the purchase price negotiated under the Site Purchase Agreement between Falck and the Province.  The Lease Agreement, obligated Valbruna to purchase the Industrial Site from Falck for the price in the Site Purchase Agreement if the Province did not complete the purchase.  In addition, the Lease Agreement gave Valbruna the option to buy the Industrial Site from the Province within the first five years of the lease term.  *See*  Prop. Doc. No. 9, App. F-3 at Art. 8; Prop. Doc. No. 51 at 10; Pub. Doc. No. 216 at 11; Prop. Fiche No. 274, Frame 21, Ex. 6.

Three aspects of the Province's Lease Agreement with Valbruna distinguished it from the Province's prior leasing experience.  *See* Pub. Doc. No. 218 at 7.  First, the Province leased the land *and buildings* to Valbruna; previously, the Province had leased land only.  *See* Pub. Doc. No. 218 at 9.  Second, the Lease Agreement had a 30-year life – the maximum under Italian law – and was the only 30-year lease in the Province.  *See* Pub. Doc. No. 218 at 9; Prop. Doc. No. 9, App. F-3 at Art. 1.  Third, the Province granted Valbruna a two-year rent abatement in exchange for Valbruna's assumption of responsibility for certain urgent, initial extraordinary maintenance and environmental remediation projects on the buildings located on the Industrial Site.  *See* Pub. Doc. No. 218 at 7-9; Prop. Doc. No. 9, App. F-3 at Art. 2.  *See* Pub. Doc. No. 218 at 9.

During the summer of 1995, Falck, Valbruna, and the Province concluded negotiations and signed the three agreements memorializing the transactions – the Site Purchase Agreement (between

Falck and the Province), the Share Transfer Agreement (between Falck and Valbruna), and the Lease Agreement (between the Province and Valbruna). Pub. Doc. No. 218 at 6; Prop. Doc. No. 25, App. 9; Prop. Doc. No. 9, App. F-1 and App. F-3.

All three agreements were subject to conditions. The Site Purchase Agreement (between Falck and the Province) required the Province to deposit its payment for the Industrial Site with the Provincial Treasury within five days after that agreement became binding on the Province. Prop. Doc. No. 25, App. 9 at Art. 1. Further, the Site Purchase Agreement would become binding only with, *inter alia*, a presidential decree of approval. *See* Prop. Doc. No. 25, App. 9 at Arts. 1, 9, 12. The Share Transfer Agreement (between Falck and Valbruna) was conditioned on Valbruna's successfully entering a lease agreement with the Province for the Industrial Site. *See* Prop. Doc. No. 9, App. F-1 at Art. 3.01. Finally, the Lease Agreement (between the Province and Valbruna) required Valbruna to purchase the Industrial Site from Falck for the same price agreed to by the Province under the Site Purchase Agreement, if the Province did not complete the purchase. *See* Prop. Doc. No. 9, App. F-1 at Art. 5.01; Prop. Doc. No. 9, App. F-3; Prop. Doc. No. 51 at 10.

## II. Analysis

As discussed in greater detail below, AL Tech alleges that – contrary to Commerce's findings – the price that the Province paid for the Industrial Site under the Site Purchase Agreement was excessive, and thus conferred a subsidy. And both AL Tech and Valbruna/Bolzano dispute aspects of Commerce's finding that the rental rate fixed in the Lease Agreement is below market and thus conferred a subsidy. Specifically, AL Tech maintains that the base ("benchmark") rental rate used by Commerce was too low and, thus, that Commerce's calculated subsidy rate is *too low*. In

contrast, Valbruna/Bolzano contends that the calculated subsidy rate is *too high*. Indeed, Valbruna/Bolzano contends that there was no subsidy. In particular, Valbruna/Bolzano faults Commerce because – in evaluating Valbruna's rent under the Lease Agreement against market rates – the agency refused to take into account depreciation on buildings, as well as certain contractual obligations that Valbruna assumed under the lease (including responsibility for extraordinary maintenance expenses, as well as expenditures for urgent initial extraordinary maintenance and environmental remediation on the Province's buildings, for which Valbruna received a two-year rent abatement).

Finally, although most of the 1.28% subsidy calculated by Commerce relates to the parties' commercial transactions, Valbruna/Bolzano also challenges Commerce's findings that countervailable subsidies were conferred by assistance received under the three government programs at issue – Law 25/81, Law 193/84, and the European Social Fund.

Each of these issues is addressed in turn below.

### A.  Commerce's Determination That The Province's Purchase of the Industrial Site Did Not Confer a Subsidy

AL Tech first disputes Commerce's determination that – judged against prevailing market conditions – the Province's purchase of the Industrial Site was not for more than adequate remuneration, and thus could not have conferred a countervailable subsidy on Valbruna/Bolzano. *See* Final Determination, 63 Fed. Reg. at 40,483-84, 40,488-89; 19 U.S.C. § 1677(5)(E) (adequacy of remuneration to be judged against market conditions). In essence, AL Tech contends that the Province of Bolzano provided a subsidy to Valbruna by overpaying Falck for its purchase of the Industrial Site – an overpayment that, according to AL Tech, was passed on to Valbruna when

Valbruna purchased the Falck subsidiary, Bolzano.  *See generally* Brief in Support of Plaintiffs'

Motion for Judgment on the Agency Record Pursuant to Rule 56.2 ("AL Tech Brief") at 11-25;

Reply Brief in Support of Domestic Industry's Motion for Judgment on the Agency Record ("AL

Tech Reply Brief") at 6-24.  *But see* Gov't Response Brief at 34-42; Valbruna Response Brief at 15-

31.

In support of its determination that Falck did not overpay for the Industrial Site, Commerce

relied on (1) the official Cadastral appraisal of the Industrial Site, (2) Valbruna's commitment to

purchase the Industrial Site at the same price to be paid by Falck if its purchase of the site was not

completed, and (3) an inference that, due to certain provisions in its Lease Agreement with the

Province, Valbruna had "a strong commercial interest" in ensuring that the Province did not pay too

much for the Industrial Site.

AL Tech challenges each of the three bases for Commerce's determination, to no avail.

## 1.  The Cadastral Appraisal

Significantly, AL Tech does not directly attack the accuracy of the actual valuation arrived

at in the official Cadastral appraisal – the first basis cited for Commerce's determination that the

Province did not pay too much for the Industrial Site.[12]  Although AL Tech repeatedly insists that

---

[12]AL Tech repeatedly seeks to minimize Commerce's reliance on the Cadastral appraisal. *See*, *e.g.*, AL Tech Brief at 21.  For example, AL Tech claims that Commerce's Final Determination "did not place great significance" on the Cadastral appraisal, and that Commerce "conce[ded] that the appraisal . . . provides only marginal support for the conclusion that the Province paid adequate remuneration for the Bolzano site."  AL Tech Brief at 21.

However, as Valbruna/Bolzano correctly notes, Commerce in fact made no such concession. Valbruna Response Brief at 20 n.15.  Indeed, in its Final Determination, Commerce cited the Cadastral appraisal first in its discussion of verified facts relied upon in its "adequate remuneration"

the price paid was too high, nowhere does AL Tech affirmatively state what it contends to be the true value of the property. Nor does AL Tech even point to any record evidence to substantiate its claim that the Cadastral appraisal overstated the value of the property.

Instead, AL Tech seeks to smear the Cadastral Office and to disparage both its expertise in general and the appraisal it conducted in this case. Indeed, AL Tech dismisses the Cadastral appraisal as "nothing more than a thinly-veiled effort to cover the Province's payment of a higher than market price to Falck in order to ensure its ability to acquire ownership of the Bolzano industrial site as a means of maintaining employment in the region." AL Tech Reply Brief at 16-17. AL Tech apparently theorizes that the Cadastral Office colluded with Provincial officials who were involved in purchasing the Industrial Site, so that the appraisal would overstate the value of the site and thus discourage other potential buyers. *See generally* AL Tech Brief at 19-21; AL Tech Reply Brief at 7-18. As discussed below, however, there is no record evidence of wrongdoing whatsoever to support AL Tech's conspiracy theory – just as there is no record evidence to indicate that the Cadastral appraisal is inaccurate in any way. Gov't Response Brief at 38-39; Valbruna Response Brief at 17-23.

Presumably because it cannot directly challenge the substantive accuracy of the Cadastral appraisal, AL Tech instead takes aim at its form. AL Tech argues, for example, that the Cadastral appraisal "includes only the most basic and elementary analysis" of the Industrial Site. AL Tech Reply Brief at 17; *see also* AL Tech Brief at 20. But the document speaks for itself, refuting that

determination. Final Determination, 63 Fed. Reg. at 40,489.

claim. In short, the evidence of record decisively disproves AL Tech's assertion that, in valuing the Industrial Site, the Cadastral Office "did little more than pick a number out of thin air." *Compare* AL Tech Reply Brief at 18 *with* Valbruna Response Brief at 18, 20-21.

The Cadastral appraisal includes substantial detail regarding the Industrial Site, including a description of the land and a map of the site (in addition to separate maps of each of the two tracts comprising the site), as well as information and data on matters such as the taxable value of the land, and the overall and per-square-meter prices paid for similar industrial sites in the Province. In addition, the appraisal expressly identifies and accounts for specific factors that affected the value of the property (increasing it or decreasing it), such as the relative scarcity of industrial property in the province and the large size of the Industrial Site, as well as the need to demolish existing structures for any non-steel-producing tenant, and the need for environmental cleanup. *See* Pub. Doc. No. 218 at 5-7; Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6; Pub. Doc. No. 173 at 000056-58.[13]

Significantly, AL Tech conspicuously fails to specifically identify any particular information that is missing from the Cadastral appraisal[14] – with one exception. AL Tech does criticize the

---

[13]In the course of conducting its verification, Commerce specifically confirmed much of the information in the Cadastral appraisal. *See generally* Pub. Doc. No. 218 at 5-7; Valbruna Response Brief at 18.

[14]AL Tech attempts to leverage its quarrel with the level of detail in the Cadastral appraisal into a larger point, in an effort to generally denigrate the Cadastral Office's expertise in appraising industrial properties within its jurisdiction. AL Tech asserts that the calibre of the Cadastral appraisal pales in comparison to other property appraisals in the administrative record. However, as discussed above, AL Tech has failed to identify any specific information that should have been included in the Cadastral appraisal, but wasn't – whether by reference to other property appraisals in the record, or otherwise. *See* AL Tech Reply Brief at 18; *but see* Valbruna Response Brief at 18 (noting Commerce's verification that Bolzano Cadastral Office followed standard methodology in

appraisal because it specifies no precise value for the buildings on the Industrial Site.  *See* AL Tech

Reply Brief at 17.  But, in fact, it is clear from the record that the buildings had no real value to the

Province.  Province officials explained that properties with the highest value were those clear of

structures, and that land encumbered with buildings had a lower value.  Thus, as Commerce verified,

the buildings on the Industrial Site were essentially not an asset to be valued, but – rather – a

liability.  *See* Pub. Doc. No. 218 at 5-7.[15]  Moreover, viewed differently, the Cadastral appraisal *did*

consider the value of the buildings:  it reflected adjustments for the costs of demolishing existing

structures and the costs of necessary environmental cleanup.  *See* Cadastral Appraisal, Prop. Doc.

---

conducting appraisals), 22 (discussing expertise of Bolzano Cadastral Office, as well as significance of an "outside" appraisal of a property in another region of Italy to which AL Tech points with approval).

[15]AL Tech elsewhere contends that the Cadastral appraisal does not deserve the weight that Commerce gave it, because (according to AL Tech) the appraisal included several sentences  that were not translated, which indicated that the value of the Industrial Site was diminished because of title problems.  AL Tech Brief at 20.  However, the appraisal that AL Tech's brief cites on this point is not the Cadastral appraisal, but – rather – the untranslated independent appraisal of the Industrial Site commissioned by Valbruna and prepared by architect Dr. Ezio Barberini.  (AL Tech does cite to the appendix to its brief as well, and the Cadastral appraisal is included there.)

In any event, it is not enough simply to baldly assert that certain text in a document which is not in English has a particular meaning.  There is no record support for AL Tech's claimed translation.  Nor is AL Tech clear as to the significance of its observation, if true.  (It is not clear, for example, whether AL Tech is suggesting that certain statements in the appraisal were deliberately left untranslated, for some assertedly nefarious reason.)

What is clear is that the Cadastral appraisal expressly stated the basis for its valuation (*i.e.*, whether or not the Industrial Site had title problems), and that the basis specified in the appraisal was consistent with the state in which the site was to be delivered to the Province, pursuant to the Site Purchase Agreement.  *See* Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6 (describing basis for valuation); Site Purchase Agreement, Prop. Doc. No. 25, App. 9 (requiring that property be delivered in same state as that specified in the appraisal).

No. 50, Ex. 6; Valbruna Response Brief at 6-7, 18.

Inexplicably, AL Tech also asserts that the appraisal fails to identify other industrial properties that the Cadastral Office used for comparison. AL Tech Reply Brief at 17. To the contrary, the appraisal specifically identifies three major industrial properties that the Cadastral Office considered – the Magnesia, Iveco, and Alluminia sites. Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6 at 5. *See generally* Valbruna Response Brief at 6-7.[16]

AL Tech next seeks to add insult to injury. After critiquing both the form of the Cadastral appraisal and the expertise of the Cadastral Office in general, AL Tech attempts to impugn their integrity as well. However, those arguments also fail.

AL Tech intimates that the Cadastral appraisal was tainted by a conflict of interest, emphasizing that "an arm of the same governmental entity that was purchasing the site [*i.e.*, the Province] was responsible for appraising the site." AL Tech Brief at 20-21. On its face, the appraisal expressly disclaims any political bias in valuing the Industrial Site. *See* Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6 at 7. But AL Tech discounts that disclaimer as "baseless in the

---

[16]AL Tech emphasizes that the appraisal itself notes the difficulty of comparing sites in the absence of an active industrial real estate market, as well as the inherent difficulty of comparing one site to another. AL Tech Reply Brief at 17-18; Cadastral Appraisal, Prop. Doc. No. 50, Ex. 6 at 7. However, the mere fact that something is difficult does not make it impossible or unreliable. Further, many appraisals suffer from at least one (if not both) of the challenges confronted here; there is no suggestion that the Cadastral appraisal is unique in that respect.

Ultimately, this argument – like a number of AL Tech's other arguments – goes, at most, to the weight to be accorded the appraisal (a matter where Commerce's experience and judgment are entitled to great deference). Moreover, as discussed in greater detail below (and as even AL Tech concedes), Commerce's determination on the adequacy of remuneration was based on more than just the appraisal alone. *See*, *e.g.*, AL Tech Brief at 11-12 (listing the various bases cited by Commerce as support for its determination).

face of the clear motivation of the Province to purchase the site to maintain employment within the region." AL Tech Brief at 20.

AL Tech's case on this point is, at best, circumstantial. *See generally* Gov't Response Brief at 38-39. Unsubstantiated suspicions are simply insufficient to cast doubt on either the veracity of the Cadastral officials or the validity of Commerce's determination in reliance on the Cadastral appraisal. *See* Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). And AL Tech points to no specific evidence to support its conflict of interest claim; nor can it do so. There is simply nothing in the record to suggest that – in the words of AL Tech – the Province's "underlying motivations" influenced the Cadastral appraisal. *See* AL Tech Brief at 20. Certainly there is nothing to suggest that Commerce harbored any such concerns.

AL Tech nevertheless pursues this line of argument even further, striving to spin an elaborate web of collusion and deceit out of various facts and dates (particularly the date of the Cadastral appraisal vis-a-vis the date of Falck's notice to the Province of its intent to close the Bolzano facility). *See generally* AL Tech Reply Brief at 7-11, 13-15. AL Tech brazenly alleges that "the Cadastral's Office, in conjunction with the Provincial government, over-valued the Bolzano industrial site" in order to "discourage private parties from attempting to purchase the site," so that the Province could gain control of the property and "attract a new company that was committed to maintain jobs." AL Tech Reply Brief at 8, 10, 15.

But, if the record is bereft of evidence to suggest that the Cadastral appraisal was tainted by conflict of interest (as it is), it is even more true that the record is barren of any evidence whatsoever to support AL Tech's theory that the Cadastral Office actively conspired with the Province to

overstate the value of the Industrial Site.[17]  AL Tech does not (and, indeed, cannot) point to even a shred of evidence to substantiate the grave charges that it implicitly levels – not only that Province authorities actively sought to influence the appraisal (and were thus guilty of official misconduct), but also that they succeeded in doing so (*i.e.*, that Cadastral officials succumbed to the hypothetical pressure of the Province, and thus were themselves also guilty of dereliction of duty and breaches of professional ethics).

AL Tech's conspiracy theory amounts to little more than compounded conjecture – speculation heaped on more speculation.  And mere speculation that the circumstances of a case would have permitted improper influence or collusion does not constitute evidence of such misconduct.  *See* Asociacion Colombiana de Exportadores v. United States, 23 CIT 148, 154, 40 F. Supp. 2d 466, 472 (1999); *see also* Novosteel SA v. United States, 294 F.3d 1261, 1276 (Dyk, J., dissenting) (Fed. Cir. 2002) ("It is well established that speculation does not constitute 'substantial evidence.'") (*citing* Bowen v. American Hospital Ass'n, 476 U.S. 610, 626 (1989)).

AL Tech's argument boils down, in essence, to a claim that the Province had both "motive"

---

[17]AL Tech's theory that the Province and the Cadastral Office conspired to overstate the value of the Industrial Site is at odds with at least one of its other arguments.  Specifically, AL Tech elsewhere rejects out of hand Valbruna/Bolzano's observation that one indicator of the reliability of the Cadastral appraisal of the Industrial Site is its consistency with other appraisals by that office.  AL Tech argues that that consistency may mean simply that the Cadastral Office overstates the value of *all* properties that it appraises.  *See* AL Tech Reply Brief at 11-12.  But either AL Tech believes that the Province manipulated the process to artificially inflate the appraised value of *this property in particular*, or AL Tech believes that the Cadastral Office routinely overvalues *all properties*.  AL Tech cannot have it both ways.

In any event, just as the record fails to substantiate AL Tech's claim that the Cadastral appraisal overstated the value of the Industrial Site here at issue, so too there is no record evidence to support AL Tech's suggestion that the Cadastral Office overvalues all properties (or even all properties acquired by the Province) as a routine matter of course.

and "opportunity" to "cook" the outcome of the Cadastral appraisal. But evidence of motive and opportunity alone rarely suffice to prove murder. What AL Tech lacks here is a corpse. One simply states the obvious to note that *governments in general* frequently have both motive and opportunity to manipulate the agencies at their disposal. What AL Tech cannot point to is any evidence whatsoever that, in this case, the Province acted on its motive and opportunity – assuming that it had them.

In short, AL Tech's argument is not truly a challenge to this Cadastral appraisal in particular, but – rather – an attempt to use a judicial forum to promulgate a regulation of general application limiting Commerce to reliance on "outside" appraisals in certain specified circumstances. Indeed, AL Tech implies that such a requirement already exists in the statute.

AL Tech makes much of an assertedly "detailed, independent appraisal" of a different industrial site prepared for the local government of a different region of Italy – the northwestern region of Valle d'Aosta. *See* AL Tech Brief at 20. AL Tech argues that such an "outside" appraisal is necessary to fulfill Commerce's statutory obligation to evaluate the adequacy of the Province's payment for the Industrial Site in light of "prevailing market conditions," and that Commerce's acceptance of the Cadastral appraisal in this case was "inconsistent" with the law. *See* AL Tech Reply Brief at 15-16 (*citing* 19 U.S.C. § 1677(5)(E)).

AL Tech misreads the statute. On its face, the statute does nothing more than list the factors to be considered in evaluating market conditions.[18] It does not speak to the means by which those

---

[18]The statute specifies that "prevailing market conditions" are to be determined by evaluating factors including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

factors are to be evaluated. Nothing in the statute requires any particular type of appraisal – "outside" or otherwise – in a situation such as that presented here. *See* Gov't Response Brief at 39 n.10.

Moreover, nothing about the Valle D'Aosta appraisal itself suggests that an "outside" appraisal was needed in this case.[19] The record does not disclose why the government of Valle D'Aosta commissioned its appraisal. Perhaps, for example, the government of Valle D'Aosta lacked some particular in-house expertise needed to evaluate the particular property in question. *See generally* Valbruna Response Brief at 22. In any event, on this record, the Valle D'Aosta appraisal proves nothing about either the adequacy or the reliability of the Cadastral appraisal here.

### 2. Valbruna's Standby Commitment to Purchase the Industrial Site

Commerce based its determination that the price the Province paid for the Industrial Site reflected market conditions (and thus did not exceed adequate remuneration) not only on the Cadastral appraisal, but on other factors as well – including Valbruna's commitment in the Share Transfer Agreement to purchase the site at the *same* price, if Falck's sale to the Province fell through. *See* Final Determination, 63 Fed. Reg. at 40,483-84, 40,488-89; Encl. 3 to Share Transfer Agreement, Prop. Fiche No. 274, Frame 18; Prop. Doc. No. 51 at 10. AL Tech contends that Commerce erred in according any weight to that commitment, because – according to AL Tech – it was entirely illusory, a "commitment Valbruna knew it would never have to uphold." *See generally* AL Tech Brief at 13-19; AL Tech Reply Brief at 19-24. *But see* Gov't Response Brief at 40-42;

_____

[19]It is, however, worth noting that the administrative record in this case does include an independent appraisal of the Industrial Site, commissioned by Valbruna. *See* Prop. Fiche No. 274, Frame 21, Ex. 6.

Valbruna Response Brief at 23-27.

AL Tech demeans Commerce's reliance on Valbruna's commitment as "highly questionable," emphasizing "the simultaneous timing" of the three interrelated transactions between Falck, the Province and Valbruna – the Share Transfer Agreement (between Falck and Valbruna), the Site Purchase Agreement (between Falck and the Province), and the Lease Agreement (between the Province and Valbruna), all of which were finalized on July 31, 1995.  AL Tech Brief at 14.  Based on that timing and on its own analysis of the interrelated terms of the three agreements, AL Tech asserts that "Valbruna was *never* exposed to the possibility of having to purchase the Bolzano site."  Indeed, according to AL Tech, "[t]he deal was structured to preclude Valbruna from having to purchase the site."  AL Tech Brief at 15.[20]

The smoking gun, in AL Tech's eyes, is a "null and void" clause in the Share Transfer Agreement, conditioning that agreement on the fulfillment of certain requirements before September 30, 1995.  *See* AL Tech Brief at 14-15; Share Transfer Agreement, Prop. Doc. No. 9, App. F-1 at

---

[20]In an effort to bolster its argument, AL Tech further asserts that Valbruna's behavior was not consistent with that of "a serious potential purchaser of the site."  AL Tech Brief at 17.  Specifically, AL Tech alleges that "Valbruna never actually participated in the negotiations concerning the sale of the land and buildings" (*id*.), and that AL Tech failed to commission an independent valuation of the Industrial Site.  AL Tech Brief at 15-17.  These claims have no merit.

Even if Valbruna's conduct had not been commercially reasonable, the fact remains that – as discussed above – Valbruna was contractually bound to purchase the Industrial Site if the Site Purchase Agreement between Falck and the Province fell through.  In any event, the record documents Valbruna's "due diligence."  Among other things, as Commerce verified, Valbruna retained an independent architect to appraise the Industrial Site.  *See* Barberini Appraisal, Prop. Fiche No. 274, Frame 21, Ex. 6; Pub. Doc. No. 216 at 11.  In addition, Commerce further verified that Valbruna officials compared the price per square meter to be paid by the Province for the Industrial Site to the prices paid for other such properties.  Pub. Doc. No. 216 at 11.

Art. 3.01. But AL Tech's contractual analysis is flawed. It fails to distinguish between the date on which the Site Purchase Agreement became "binding for the Province" and the dates by which the parties had to have fulfilled the specified conditions subsequent so that Falck's sale of the land to the Province could be completed. *See generally* Valbruna Response Brief at 25-26.

By its terms, the "null and void" clause cited by AL Tech operates only if the Site Purchase Agreement does not become "binding for the Province" by a certain subsequent date. Share Transfer Agreement, Prop. Doc. No. 9, App. F-1 at Art. 3.01. And, by its terms, the Site Purchase Agreement "becomes binding for [the Province], once the presidential decree of approval of this agreement and the undertaking for the related expense have been registered by the Court of Accounts." Site Purchase Agreement, Prop. Doc. No. 25, App. 9 at Art. 12. After those actions had been taken, the purchase was "binding" on the Province, and the "null and void" clause would have no effect.

In contrast, the Province was obligated to deposit its payment in the Provincial Treasury within five days after the enforcement date of the presidential decree, and Bolzano and Falck were required to provide a performance bond within 20 days of signing. *See* Site Purchase Agreement, Prop. Doc. No. 25, App. 9 at Arts. 1, 6. Thus, the Site Purchase Agreement established conditions subsequent to the formation of the contract that the parties were obligated to fulfill after the contract became binding.

In short, contrary to AL Tech's assertions,[21] it was entirely possible that – after the Site

---

[21]Indeed, it appears that AL Tech has essentially abandoned its claim that "Valbruna was *never* exposed to the possibility of having to purchase the Bolzano site." On this point, AL Tech's Reply Brief is silent, apparently conceding the flaws in the contractual analysis in its opening brief, and tacitly admitting that – under certain circumstances – Valbruna could have been required to purchase the Industrial Site.

Purchase Agreement was signed on July 31, 1995 – the purchase could have become "binding" on the Province, but that the Province, Bolzano or Falck could have defaulted on their performance of conditions subsequent. In that case, Falck's land sale to the Province would not have been completed, and Valbruna would have been obligated to honor its stand-by guarantee under the Share Transfer Agreement by purchasing the Industrial Site.[22]

### 3. Commerce's Inference As to Valbruna's "Commercial Interest"

Just as AL Tech contests the first two bases for Commerce's "adequate remuneration" determination (*i.e.*, the Cadastral appraisal and Valbruna's standby commitment), so too AL Tech challenges the agency's third (and final) basis: Commerce's inference that Valbruna had "a strong commercial interest" in ensuring that the Province did not pay too much for the Industrial Site, because both (a) Valbruna's rent was to be determined as a percentage of the Province's purchase price, and (b) Valbruna's Lease Agreement with the Province gives Valbruna an "option to buy" the

---

[22]AL Tech tries to make much of Commerce's recognition in its Final Determination that "it was highly unlikely that Valbruna would have to perform on [its] obligation" under the Share Transfer Agreement to purchase the Industrial Site. *See* AL Tech Brief at 18-19 (*quoting* Final Determination, 63 Fed. Reg. at 40,489); AL Tech Reply Brief at 22-24. However, Commerce's statement is simply an acknowledgment that all parties to the three transactions fully expected that the Province would purchase the Industrial Site. *See* Valbruna Response Brief at 26.

Moreover, the mere fact that a particular significant event may have a *low probability of occurrence* does not diminish in any way the *consequences* of that event if it does occur. As discussed above, if a party had failed to perform as required by certain conditions subsequent in the Site Purchase Agreement, Falck's sale to the Province would not have been completed, and Valbruna would have been obligated by the Share Transfer Agreement to purchase the Industrial Site. Whether or not a party was *likely* to fail to fulfill those conditions subsequent (and thus to trigger Valbruna's obligation to purchase the Industrial Site) is of no moment.

Industrial Site within five years of signing the lease.[23]  Final Determination, 63 Fed. Reg. at 40,489.

Here again, AL Tech's arguments fail to carry the day.  *See generally* AL Tech Brief at 22-25; AL Tech Reply Brief at 19-22.  *But see* Valbruna Response Brief at 27-31; Gov't Response Brief at 41-42.

Invoking the statute, AL Tech argues that inference is an inappropriate basis for a determination by Commerce.  *See* AL Tech Brief at 23-24 (*citing* 19 U.S.C. § 1677m(i)(1) (1998)).  But the statutory provision cited is simply inapposite.  It requires only that Commerce verify all *factual* information on which it relies.  *See* AL Tech Specialty Steel Corp. v. United States, 22 CIT 941, 945(1998), 1998 WL 661461 ( Sept. 24, 1998) ("Under 19 U.S.C. § 1677m(i) . . . , Commerce is required to verify all *factual* information relied upon in making a final determination"(emphasis added)).

Nothing in the statute (or elsewhere) prohibits the agency from interpreting the facts that it

---

[23]AL Tech initially contends that – as a factual matter – Commerce did not rely on Valbruna's commercial interests as a basis for its determination.  AL Tech points to language in the Final Determination enumerating (1) the Cadastral appraisal, (2) Valbruna's standby commitment, and (3) the Province's fulfillment of its contractual commitments in connection with the purchase of the Industrial Site.  AL Tech emphasizes that that list does not include any inference concerning Valbruna's commercial interests.  *See* AL Tech Brief at 23 (*quoting* Final Determination, 63 Fed. Reg. at 40,489).

However, that reading of the Final Determination is artificially narrow, and strained.  It ignores other language just two paragraphs later, which amplifies the language that AL Tech cites and  which expressly states that Commerce is relying on Valbruna's "strong commercial interest" as "an indication that the price paid by the Province of Bolzano for the Bolzano industrial site was reflective of market considerations."  Final Determination, 63 Fed. Reg. at 40, 489.

In short, while perhaps it might have been drafted more artfully, the Final Determination leaves no room for doubt that Commerce's finding on the remuneration paid by the Province relied in part on an inference as to Valbruna's commercial interests.  *See generally* Valbruna Response Brief at 27-28.

has verified, and drawing reasonable inferences and conclusions from that verified information. *See*

Bowe Passat Reinigungs-Und Waschereitechnik v. United States, 20 CIT 1426, 951 F. Supp. 231,

235 (1996) (Commerce entitled to "make justifiable inferences on the record before it"); *see also*

Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). That is precisely

what Commerce did in this case.

AL Tech argues, in the alternative, that – even if Commerce is entitled to rely on inference

in reaching its determinations – the agency erred in doing so here, because (according to AL Tech)

"[t]here is no logical or business reason why Valbruna would have a 'strong commercial interest'

in ensuring the lowest possible price when the record is clear that Valbruna never expected to have

to pay that price itself." AL Tech Brief at 24. However, as discussed in section II.A.2 above, AL

Tech's fundamental premise is wrong. Contrary to AL Tech's claims, Valbruna's standby

commitment to purchase the Industrial Site was no mere "empty promise."

Not content simply to dispute Commerce's inference that Valbruna had "a strong commercial

interest" in ensuring that the Province paid the lowest possible price for the Industrial Site, AL Tech

goes even further. AL Tech argues that Commerce got it exactly backwards. According to AL Tech,

"Valbruna stood to *gain* from the Province's purchase . . . at the highest possible price because, as

a result of that transaction, Valbruna was able to reduce the debt of its simultaneously-acquired

subsidiary, Bolzano."[24] As AL Tech so graphically puts it, "[e]very extra lira paid by the Province,

---

[24]Valbruna/Bolzano observes that AL Tech's argument here "must be limited to that portion of the purchase price paid directly to Bolzano. . . . [T]he Province purchased one of the two industrial sites from Immobliarie Toce, the real estate subsidiary of Falck. Payments made to Falck could not have affected the level of Bolzano's debt, and therefore could not have benefitted Valbruna even under [AL Tech's] theory." Valbruna Response Brief at 30 n.17.

in effect, went into Valbruna's bottom line." *See* AL Tech Brief at 24-25.

But, as in section II.A.2 above, yet again AL Tech misunderstands the provisions of the various contracts. By the terms of the Share Transfer Agreement, any gain accruing to Bolzano as a result of the sale of the Industrial Site was essentially added to Bolzano's "net equity" at the time of the transfer, and thus would increase the purchase price of the Bolzano shares to be paid by Valbruna to Falck.[25] And, contrary to AL Tech's claims, Bolzano's use of the funds received from its portion of the Industrial Site sale had no effect on either the price Valbruna paid for Bolzano or the value of the company it purchased. *See generally* Valbruna Response Brief at 30-31.

In its Reply Brief, AL Tech largely retreats from the arguments advanced in its opening brief and instead debuts a new plan of attack on Commerce's inference, seeking to pit that inference against Commerce's finding that the rental rate specified in the Lease Agreement constituted less than adequate remuneration – a determination discussed in greater detail in section II.B, below. In essence, AL Tech's Reply Brief argues that Commerce's finding that the rental rate specified in the Lease Agreement was less than adequate remuneration logically undercuts any claim that the linkage between Valbruna's rent and the purchase price that the Province was to pay for the Industrial Site – as well as Valbruna's "option to buy" – gave Valbruna "a strong commercial interest" in ensuring that the Province did not pay too much for the Industrial Site. *See generally* AL Tech Reply Brief at 19-22.[26]

---

[25]*See* Share Transfer Agreement, Prop. Doc. No. 9, App. F-1 at Art. 2.01, 5.01; Prop. Doc. No. 22 at 3-4.

[26]Although AL Tech characterizes this line of argument as a "reply" to arguments raised in the response briefs filed by the Government and Valbruna/Bolzano (*see* AL Tech Reply Brief at 21), in fact AL Tech's argument clearly could (and should) have been raised in its opening brief. AL

AL Tech emphasizes that, before signing the Lease Agreement, Valbruna knew that its rent for the Industrial Site would be calculated as four percent of the purchase price agreed to by the Province and Falck – a rental rate AL Tech characterizes as "significantly below the prevailing market rate." AL Tech further asserts that, in light of that rental rate, "Valbruna had significantly less incentive to monitor closely the ultimate price paid by the Province." AL Tech Reply Brief at 20.

To the contrary, even assuming that the rental rate was below market (*see* section II.B, *infra*), Valbruna still had ample incentive to ensure that the Province paid the lowest possible price for the Industrial Site. The *rental rate* was, at most, half of the equation; the *purchase price* to be paid by the Province was just as significant (if not more). Indeed, to paraphrase AL Tech itself (on a related point), part of "[e]very extra lira [saved] by the Province, in effect, went into Valbruna's bottom line." *See* AL Tech Brief at 24-25.

In sum, AL Tech's attacks cast no doubt on the fundamental merits of Commerce's determination that the Province's purchase of the Industrial Site did not confer a subsidy. Commerce's determination to that effect is supported by substantial evidence and otherwise in accordance with law, and is, therefore, sustained.

### B. Commerce's Determination That The Province's Lease Agreement With Valbruna Conferred a Subsidy

Concurrent with Falck's sale of the Industrial Site to the Province, the Province in turn leased the Industrial Site to Valbruna. *See* Final Determination, 63 Fed. Reg. at 40,483; Lease Agreement,

---

Tech's unfortunate timing deprived the other parties of the opportunity to respond to its contentions, and deprived the Court of the benefit of complete briefing.

Prop. Doc. No. 9, App. F-3. In its Final Determination, Commerce concluded that the Lease Agreement between the Province and Valbruna conferred a countervailable subsidy, based on the agency's finding that Valbruna's rent does not constitute adequate remuneration to the Province. *See* Final Determination, 63 Fed. Reg. at 40,484-85, 40,489-90. Commerce reached that finding by comparing the rent to be paid under the Lease Agreement with the 5.7% "benchmark rate of return" which it found to be "the average rate of return on leased commercial property in Italy." *See* Final Determination, 63 Fed. Reg. at 40,484.

AL Tech challenges Commerce's adoption of the 5.7% benchmark rate, asserting that it is too low. *See* AL Tech Brief at 25-30; AL Tech Reply Brief at 25-33. Valbruna/Bolzano, in turn, contests Commerce's overall determination that its rent under the Lease Agreement does not constitute adequate remuneration to the Province, asserting that Commerce improperly failed to factor into its calculations (1) a two-year rent abatement granted in the Lease Agreement in exchange for Valbruna's assumption of responsibility for certain initial extraordinary maintenance and environmental remediation projects at the Industrial Site, (2) the Lease Agreement's assignment of responsibility for ongoing extraordinary maintenance over the life of the lease to Valbruna; and (3) depreciation on the buildings at the Industrial Site. *See* Valbruna Brief at 17-38; Valbruna Reply Brief at 1-24.

As discussed in greater detail below, AL Tech's challenge to the 5.7% benchmark rate is in vain. Valbruna/Bolzano's arguments, on the other hand, call into question Commerce's determination that Valbruna's rent under the Lease Agreement does not constitute adequate remuneration.

### 1. Commerce's "Benchmark" Rate of Return

AL Tech argues first that – in reaching its determination that Valbruna's rent under its Lease Agreement with the Province did not constitute adequate remuneration – Commerce failed to explain why it chose as its benchmark an Italian national average rate of 5.7%, when the record includes a region-specific rate (the "REAG rate"),[27] which is – at least, without adjustments – higher than the 5.7% rate. In addition, AL Tech argues that Commerce's selection of the 5.7% rate was inconsistent with then-applicable law. Neither claim is compelling.

AL Tech alleges generally that Commerce failed to articulate the basis for its decision to choose the 5.7% rate as its benchmark. But AL Tech's real complaint – notwithstanding the fact that it did not advocate use of the REAG rate in the administrative proceedings before Commerce[28] – is

---

[27]The Real Estate Advisory Group – "REAG" – is a private Italian real estate appraisal firm which prepared an analysis of the Industrial Site and the Lease Agreement, which was filed with Commerce in the course of the administrative proceeding. *See* Valbruna Response Brief at 32; *see also* Pub. Doc. No. 44, Att. 1.

[28]AL Tech devotes a significant portion of its Reply Brief to arguing that its challenge to Commerce's determination of the benchmark rate should not be dismissed based on the doctrine of exhaustion of administrative remedies. *See* AL Tech Reply Brief at 26-30. However, Valbruna/Bolzano does not advance an exhaustion argument; and the Government's argument is a mere two sentences, supported by a single citation to the relevant statute. *See* Valbruna Response Brief at 32-46; Gov't Response Brief at 49 (*citing* 28 U.S.C. § 2637(d)).

However, both the Government and Valbruna/Bolzano highlight AL Tech's hypocrisy: In the administrative proceeding before Commerce, AL Tech criticized the very REAG rate that it now advocates. *See* Gov't Response Brief at 47-48; Valbruna Response Brief at 36-37. In the administrative proceeding before Commerce, AL Tech first urged Commerce to visit a non-governmental institution with the requisite expertise to obtain an appropriate benchmark rate – which is how Commerce obtained the 5.7% rate on which the agency ultimately relied. *See* Gov't Response Brief at 47 (*citing* AL Tech's April 10, 1998 Submission, Prop. Doc. No. 45 at 10). AL Tech next argued for a bank loan-based rate, rather than the bond-based rate used in the Preliminary Determination. *See* Gov't Response Brief at 48 (*citing* AL Tech's June 11, 1998 case brief, Prop. Doc. No. 58 at 21). AL Tech argued at the time that Commerce should reject the REAG rate –

that Commerce failed to explain why it chose the 5.7% rate over the REAG rate. *See* AL Tech Brief

at 26-28; AL Tech Reply Brief at 30-31.

Contrary to AL Tech's assertions, Commerce not only adequately articulated the basis for

its reliance on the 5.7% rate, it also explained the basis for its determination that the 5.7% rate was

more reliable and better reflective of the market than other proposed rates. Moreover, the basis for

---

which Valbruna/Bolzano had proposed – because, according to AL Tech, it was based on unverified information. Gov't Response Brief at 48 (*citing* AL Tech June 16, 1998 rebuttal brief, Prop. Doc. No. 60 at 33). Now, here, however, AL Tech has decided to embrace the REAG rate – at least, the REAG rate without adjustments.

AL Tech claims that its argument in this forum is consistent with its arguments before Commerce, which, it says, implicitly recognized the REAG rate as the alternative. *See* AL Tech Reply Brief at 29. Further, AL Tech asserts that it should not be penalized for Commerce's "last minute and unanticipated reliance" on the 5.7% rate. AL Tech Reply Brief at 29-30. But, contrary to AL Tech's implication, all parties had the opportunity to address the 5.7% rate in their case briefs filed with the agency. *See* Valbruna Case Brief, Pub. Doc. No. 225 at 13 n.39. In short, AL Tech's attempts to reconcile its position in this forum with its position before Commerce are not persuasive. But it is AL Tech's exhaustion defense that matters here.

AL Tech invokes a well-established exception to the doctrine of exhaustion, arguing that – because Commerce had ample opportunity to address the issue – AL Tech should not be precluded from challenging the benchmark rate here (even though its position in this forum may be inconsistent with its position before the agency). *See* AL Tech Reply Brief at 26-27 (*citing* McKart v. United States, 395 U.S. 185, 194 (1969) (the purpose of the doctrine of exhaustion is to allow an agency the opportunity to address an issue); Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 555 n.6, 15 F. Supp. 2d 807, 820-21 n.6 (1998) (excusing a party's failure to exhaust where a third party raised the argument in a related proceeding); Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 173, 178 n. 9, 6 F. Supp. 2d 865, 874 (1998) (excusing failure to exhaust, even though party advocated different adjustments on appeal). Here, the REAG rate was argued – and contested – before Commerce. *See* AL Tech Reply Brief at 28-30; Valbruna Response Brief at 36-37; Gov't Response Brief at 47-48. And Commerce's Final Determination reflects its consideration of those arguments. *See* Final Determination, 63 Fed. Reg. at 40,484.

*See also* Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (recognizing an exception to the doctrine of exhaustion for purely legal questions); Timken Co. v. United States, 26 CIT ___, 240 F. Supp. 2d 1228, 1238 (2002) (*quoting* FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT, 82, 131 F. Supp. 2d 104, 114 (2001)).

Commerce's selection of the 5.7% rate over the REAG rate in particular is clear on the record as well.

The administrative record evidences Commerce's painstaking approach to the selection of a benchmark rate. In its Preliminary Determination, the agency used a rate based on the return on treasury bonds. Certain Stainless Steel Wire Rod from Italy, 63 Fed. Reg. 809, 822 (Dep't Commerce Jan. 7, 1998) (prelim. determination) ("Preliminary Determination"). However, Commerce fine-tuned its methodology for the Final Determination.

In reaching its Final Determination, Commerce specifically considered, *inter alia*, whether a non-governmental rate – like the REAG rate, suggested by Valbruna/Bolzano – would provide a more appropriate benchmark. Further, before reaching a decision, Commerce carefully weighed the parties' views. Final Determination, 63 Fed. Reg. at 40,484.

As the Government notes, AL Tech initially urged Commerce to obtain a benchmark rate from a commercial, non-governmental institution in Italy with expertise in commercial and industrial leasing.[29] *See* n. 28, *supra*. In response to AL Tech's recommendation, Commerce consulted the leading Italian-owned real estate firm, Gabetti per L'impresa, with more than 20 years of experience in commercial and industrial leasing throughout that country to its credit. *See* Gov't Response Brief at 46-47. Gabetti per L'impresa provided Commerce with the 5.7% rate, based on a long-term lease of industrial property in Rome, assuring Commerce that it was an average rate that could be applied throughout Italy. *See* Pub. Doc. No. 223 at 2.

---

[29]Commerce had previously used a rate provided by a third party. *See* Extruded Rubber Thread from Malyasia, 60 Fed. Reg. 51,982, 51,984 (Dep't Commerce Oct. 4, 1994) (final determination).

On the strength of, *inter alia*, those consultations, Commerce determined that the 5.7% rate appropriately reflected "different terms, lengths, and locations of lease contracts throughout Italy." Moreover, as explained in its Final Determination, Commerce concluded that the 5.7% rate was preferable to the rate the agency used in its Preliminary Determination, which required "a number of complicated and highly speculative adjustments." Similarly, because the 5.7% rate provided "a reliable average rate of return on commercial leased property," Commerce concluded that the 5.7% rate "better reflect[ed] commercial practices in Italy" than the adjusted bank loan rate that AL Tech proposed. Overall, Commerce determined that, compared to the other rates considered, the 5.7% rate was "a more reliable and representative rate to use in examining whether the [Industrial Site] is being leased for less than adequate remuneration." *See* Final Determination, 63 Fed. Reg. at 40,484, 40,490.

The Final Determination does not specifically detail the basis for Commerce's selection of the 5.7% rate over the REAG rate that Valbruna/Bolzano advocated. However, it expressly states that the agency considered the REAG rate and weighed its merits against the other proposed rates on the record, including the 5.7% rate. *See* Final Determination, 63 Fed. Reg. at 40,484 ("We have reconsidered [*inter alia*, the various proposed rates] in light of the information gathered at verification and comments from the interested parties."). Moreover, Commerce's selection of the 5.7% rate was an implicit rejection of, *inter alia*, the REAG rate. And, although the Final Determination did not discuss the REAG rate specifically, Commerce adequately articulated its rationale, alerting the careful reader to the reasons it decided against the REAG rate.

For example, one major concern documented in the record was that the rate of return

discussed in the REAG study was not an average rate for all types of industrial leases throughout the

Province.  Rather, it was specific to a certain type of lease, which was unlike the Lease Agreement

here.[30]  Tailoring the REAG rate to determine the appropriate rate of return for this Lease Agreement

– which is unique in several respects – would have required multiple adjustments.  *See generally*

Valbruna Response Brief at 32 n.18, 41-46; Gov't Response Brief at 49-50.  And the need to make

such extensive adjustments is exactly why Commerce's Final Determination shied away from the

rate used in its Preliminary Determination.  *See* Final Determination, 63 Fed. Reg. at 40,484, 40,490.

In sum, where – as here – "the agency's decisional path is discernible" from the record, the

type of "explicit explanation" that AL Tech seeks is not necessary.  *See* Wheatland Tube Co. v.

United States, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998).

AL Tech also alleges that Commerce's use of the 5.7% rate was inconsistent with the

applicable law.  According to AL Tech, the agency should have selected a region-specific rate

(rather than a national average rate), because the applicable law required that benchmarks be based

on information from "the same political jurisdiction."  *See* AL Tech Brief at 29-30.  But AL Tech

cited outdated law.[31]

---

[30]The rates set forth in the study of the Real Estate Advisory Group ("REAG") – 8.24%/8.8%
– are not for 30-year industrial leases, like the Lease Agreement here at issue.  Rather, those rates
are for six-year leases that include a right to renew for an additional six years, and which reflect an
allocation of responsibilities between lessor and lessee that differs from that in the Lease Agreement
here.  *See* Valbruna Response Brief at 44-46 (*citing* Prop. Doc. No. 44, Att. 1).

[31]*See* AL Tech Brief at 29-30 (*citing* Notice of Proposed Rulemaking, 54 Fed. Reg. 23,366,
23,381 (Dep't Commerce May 31, 1989) (to have been codified at 19 C.F.R. § 355.4(f)(2)(ii)).  The
proposed regulations that AL Tech cites were superseded by amendments in the Uruguay Round
Agreements Act, codified at 19 U.S.C. § 1677(5)(E)(iv).

In substance, however, the controlling law reflects essentially the same concern – ensuring that Commerce's methodology accurately reflects any benefit conferred. The applicable statute, 19 U.S.C. § 1677(5)(E)(iv), grants Commerce wide latitude to choose from among several levels of political jurisdiction in identifying an appropriate benchmark rate.[32] The statute conspicuously does not dictate any particular order of preference that the agency must follow. Here, Commerce considered rates at both the "foreign country" and "political subdivision" levels. *See* U.S.C. 19 U.S.C. § 1677(3). And, after considering the regional REAG rate and others, Commerce determined that the national average 5.7 % rate was "a reliable average rate of return on commercial leased property," appropriate under the specific circumstances of this case. *See* Final Determination, 63 Fed. Reg. at 40,490.

Counsel for AL Tech conceded at oral argument that both the REAG rate and the 5.7% rate are problematic,[33] but he maintained that the REAG rate was more accurate than the 5.7% rate selected by Commerce. Tr. at 95-96. As detailed above, however, Commerce considered at least

---

[32]The provision cited by AL Tech referred to "the price charged by other sellers to buyers within the same political jurisdiction." By comparison, the operative language in the controlling statute refers to "prevailing market conditions in the country." *See* Valbruna Response Brief at 38-40 (*quoting* 19 U.S.C. § 1677(5)(E) (1994)); AL Tech Brief at 29-30 (*citing* Notice of Proposed Rulemaking, 54 Fed. Reg. 23,366, 23,381 (Dep't Commerce May 31, 1989) (to have been codified at 19 C.F.R. § 355.4(f)(2)(ii)); AL Tech Reply Brief at 32-33. The meaning of "political jurisdiction" was retained in the existing statute's reference to "country," which lists several levels of political jurisdiction – including "foreign country" and "political subdivision" – to which Commerce can look in identifying an appropriate benchmark. *See* 19 U.S.C. § 1677(3).

[33]Indeed, given the particular circumstances of this case, no proposed benchmark rate could be problem-free – that is, none could directly apply to this Lease Agreement. For example, this Lease Agreement was the first (and only) 30-year lease in the Province. Pub. Doc. No. 218 at 9. Thus, it would be impossible for Commerce to obtain a directly-applicable, region-specific benchmark rate.

four different rates as possible benchmarks in this case. From among those four, Commerce selected the rate that it determined best reflected commercial leasing practices in Italy – which, coincidentally, happened to be the rate developed pursuant to the methodology AL Tech initially proposed.

Accordingly, like AL Tech's first challenge to the 5.7% benchmark rate, this argument too must be rejected. AL Tech's attacks on Commerce's adoption of the 5.7% rate fail to carry the day.[34]

### 2. Valbruna's Proposed Adjustments To Commerce's Calculation of Rent

Although – unlike AL Tech – Valbruna/Bolzano does not directly dispute Commerce's 5.7% benchmark rate *per se*, it does so more or less implicitly, by challenging Commerce's refusal to factor into its "adequate remuneration" analysis of the Lease Agreement (1) the two-year rent abatement that Valbruna received under the Lease Agreement in exchange for its assumption of responsibility for certain initial extraordinary maintenance and environmental remediation projects at the Industrial Site, (2) Valbruna's assumption under the Lease Agreement of responsibility for ongoing extraordinary maintenance over the life of the 30-year lease, and (3) depreciation on the buildings at the Industrial Site. Valbruna/Bolzano asserts that these three adjustments to Commerce's calculations are necessary to ensure that its rent can be compared to the agency's 5.7% benchmark rate on an "apples-to-apples" basis. *See generally* Valbruna Brief at 17-38; Valbruna Reply Brief at 1-24.

Each of Valbruna/Bolzano's three challenges is considered in turn below. As discussed in

---

[34] Because Commerce's use of the 5.7% benchmark rate is sustained, there is no need to reach the parties' arguments concerning adjustments to the REAG rate. *See* Valbruna Response Brief at 41-46; AL Tech Reply Brief at 33.

greater detail there, Valbruna/Bolzano's arguments are compelling.

Commerce calculated the subsidy rate associated with Valbruna's two-year rent abatement at 0.38%. The subsidy rate associated with other aspects of the asserted rent shortfall was calculated at 0.16%. Together, these factors constitute the single largest component of the 1.28% overall subsidy rate calculated by Commerce – 0.54 % in total.

### a. Valbruna's Two-Year Rent Abatement in Exchange for Initial Extraordinary Maintenance and Environmental Remediation

Valbruna/Bolzano first assails Commerce's decision to treat as a subsidy the two-year rent abatement granted to Valbruna under its Lease Agreement with the Province. According to Valbruna/Bolzano, the rent abatement was part of a "bargained-for exchange" in which Valbruna agreed, in turn, to assume the Province's responsibility for certain specific, urgent, initial extraordinary maintenance and environmental remediation projects related to the buildings that it leased from the Province.[35]  *See* Lease Agreement, Prop. Doc. No. 9, App. F-3 at Fwd. Para. (e), Art.

---

[35]In this action, Valbruna/Bolzano raises two separate issues concerning Valbruna's Lease Agreement with the Province and  "bargained-for" allocations of responsibility for two different types of extraordinary maintenance.

This section addresses Valbruna/Bolzano's claims concerning expenditures for urgent, *initial* extraordinary maintenance and environmental remediation projects that Valbruna undertook in exchange for a two-year rent abatement – essentially a "punchlist" of certain major maintenance and remediation projects that the parties knew about at the time of their negotiations, and on which they reached specific agreement. *See* Valbruna Brief at 18-30; Valbruna Reply Brief at 1-15. In contrast, section II.B.2.b below relates to Valbruna's assumption of responsibility for *future* (or ongoing) extraordinary maintenance – *i.e.*, the responsibility for all future extraordinary maintenance over the 30-year life of the Lease Agreement. *See* Valbruna Brief at 31-37; Valbruna Reply Brief at 16-21.

2.[36]  *See generally* Valbruna Brief at 17-31; Valbruna Reply Brief at 1-15.

However, based on its analysis of the two main projects that Valbruna completed, Commerce concluded – in essence – that the bargain struck between the Province and Valbruna was meaningless, because (according to Commerce) the measures that Valbruna undertook were not obligations of the Province, and thus could not have constituted "consideration" for the rent abatement granted to Valbruna.  *See* Final Determination, 63 Fed. Reg. at 40,484-85.[37]  *See also*

---

[36]As Commerce's Final Determination noted, when the Province purchased the Industrial Site, it had "a number of environmental problems that required costly repairs." Final Determination, 63 Fed. Reg. at 40,485.  The Province's Lease Agreement with Valbruna indicates on its face that the two-year rent abatement is a bargained-for exchange, with Valbruna assuming responsibility for certain critical initial extraordinary maintenance and environmental remediation projects in lieu of paying rent.

> [*The rent to be paid* every six months] for the renting of the industrial premises *shall amount to* [      ] lira, plus VAT, *to be paid starting after two years* from the first day of the following month, once the approval resolution of this agreement has become effective, *in consideration of the expenditure and the time required for the restoration of the existing productive premises* [by Valbruna].

Lease Agreement, Prop. Doc. No. 9, App. F-3, Fwd. Para. (e) (emphasis added).  A list of the initial extraordinary maintenance and environmental issues that Valbruna agreed to remedy was included as an attachment to the Lease Agreement.  Final Determination, 63 Fed. Reg. at 40,485.

Commerce independently confirmed the terms of the Lease Agreement itself and the parties' intent in the course of the agency's verification process.  Indeed, Commerce's verification report expressly found that "The Province provided Valbruna with a two year exemption on [rent] payments to account for costs incurred by the company" on initial extraordinary maintenance and environmental remediation projects.  Pub. Doc. No. 218 at 9.

[37]The Government and AL Tech emphasize that Commerce's Final Determination found that rent abatements such as those granted to Valbruna were "extremely unusual."  *See* Gov't Response Brief at 56; Response Brief [of AL Tech] in Opposition to Italian Producers' Motion for Judgment on the Agency Record ("AL Tech Response Brief") at 15-16.  However, the Final Determination further stated that "a commercial landlord may very well have given a similar exemption" in exchange for a tenant's agreement to undertake critical extraordinary maintenance and environmental remediation measures such as those at issue here.  Final Determination, 63 Fed. Reg. at 40,485.  *See*

Gov't Response Brief at 55-60; AL Tech Response Brief at 7-18.

Based on the rent that Valbruna would have owed the Province absent the two-year abatement, Commerce calculated a subsidy of 0.38% – the single largest component of the overall subsidy at issue in this action. Indeed, as Valbruna/Bolzano pointedly observes, if Commerce had not deemed the rent abatement to be a subsidy, the overall subsidy would have been calculated at 0.90% – below the statutory one percent *de minimis* level – and Commerce would not have issued a countervailing duty order. *See* Valbruna Reply Brief at 1.

The first project analyzed in Commerce's Final Determination concerned measures taken to

---

*also* Valbruna Brief at 19; Valbruna Reply Brief at 30-31.

AL Tech tries to make much of the fact that Valbruna is the only lessee ever granted such a rent abatement by the Province in exchange for its agreement to undertake initial extraordinary maintenance and environmental remediation measures. *See* AL Tech Response Brief at 16. But AL Tech omitted the very next paragraph of the verification report that it quotes, which takes the wind out of AL Tech's sails:

> Province officials stated that this lease is an exception because *this was the first lease where the Province leased both land and buildings*. Other agreements involving the Province were limited to the lease of land. The official stated that this arrangement poses a burden on the Province because it requires them to spend time dealing with issues relating to the maintenance and oversight of the buildings on the land.
>
> *       *       *       *
>
> [U]nder the lease, Valbruna is responsible for extraordinary maintenance because *its lease is the only one that includes land and buildings*, and because the Province does not have the personnel or time to oversee and supervise extraordinary maintenance activities.

Pub. Doc. No. 218 at 9 (emphasis added). *See also* Valbruna Reply Brief at 13 (noting that, "while the Province normally protected itself through an indemnification clause in its transactions involving land only (as it did also in this case), it had no prior experience in transactions involving buildings").

"encapsulate" the melting furnace to abate noise and air pollution.  Commerce emphasized that the

need for some measure "had been identified several years prior to the [Province's] purchase of [the

Industrial Site]," after local residents complained.  According to the Final Determination, "[t]he

Province asked Bolzano to develop a proposal to solve the problem," and "[i]n 1992, the Province

agreed to Bolzano's proposal to encapsulate the melting furnace."  The Final Determination further

states, "[b]y 1995 [when the Province purchased the Industrial Site, and then leased it to Valbruna],

Bolzano still had not undertaken the encapsulation project.  Instead, it was included in the round of

environmental work covered by the lease payment exemption."  Final Determination, 63 Fed. Reg.

at 40,485.

Commerce concluded that the Province was not obligated to undertake the furnace

encapsulation project, "because the obligation was incurred before the lease [with Valbruna]."[38]  As

Commerce summed up its rationale:

> [T]he Province imposed an obligation on Bolzano to undertake environmental
> measures several years before the signing of the lease.  Then, the Province agreed to
> forgo revenue in order to see that the obligation was fulfilled.

Final Determination, 63 Fed. Reg. at 40,485.

Although Commerce's rationale is so terse that it is difficult to follow (and its summary so

---

[38]It seems likely that what Commerce actually meant to say here was *not* that the Province
was not obligated to undertake the furnace encapsulation project "because the obligation was
incurred *before the lease* [*with Valbruna*]," but – rather – because the obligation was incurred *before
the Province's purchase of the property*.

In any event, the overall point that Commerce seeks to make is that the Province (as a new
property owner/landlord/lessor) was absolved of all responsibility for events, hazards and conditions
that pre-dated its ownership.  But that point is not consistent with either the record here, or with
common sense.

clever that it seems compelling, at first blush), closer scrutiny suggests a fundamental flaw in the

agency's logic. In essence, Commerce appears to conflate the dual roles of the Province – as a

sovereign on the one hand, and as a commercial actor on the other – and thus to confuse the rights

and responsibilities of the Province *qua* sovereign with those of the Province *qua* property

owner/lessor. In other words, even assuming that the Province (acting in its sovereign capacity)

"imposed an obligation on Bolzano to undertake environmental measures" several years before the

Province (acting in its commercial capacity) purchased the Industrial Site and entered into a lease

with Valbruna,[39] the fact remains that – as Commerce found in its Final Determination – "[u]nder

Italian law, the landlord would normally bear the responsibility for pre-existing environmental costs

under a normal lease agreement." Final Determination, 63 Fed. Reg. at 40,485.

Thus, when the Province (acting in its commercial capacity) purchased the Industrial Site,

it essentially inherited – as the new property owner/lessor – the environmental hazard that it (acting

in its sovereign capacity) had sought to have remedied some years before. At least vis-a-vis its new

lessee, Valbruna, Italian law obligated the Province (in its commercial capacity, as landlord/lessor)

---

[39]As Valbruna/Bolzano aptly observes, Commerce seeks to make too much of the significance of the discussions between the Province and Bolzano as to the complaints of local residents and the Province's request that Bolzano develop a proposal to address those complaints. *See*, *e.g.*, Valbruna Brief at 29 n.63. For example, neither the Final Determination nor the Government's brief cites to any record evidence to support the implication that Bolzano was somehow *legally obligated* to undertake remedial measures to respond to the concerns of local residents and the Province. (Moreover, even if Commerce had in fact established that Bolzano did have such a legal obligation *before* the Site Purchase Agreement and the related transactions, there is no record evidence to establish that the Province – which purchased both the land and the buildings – would have been absolved of responsibility for the problem *after* the transactions.)

to "bear the responsibility for pre-existing environmental costs." In a "bargained-for exchange," Valbruna agreed to undertake the encapsulation project (among others), in return for the Province's grant of a two-year rent abatement. Viewed from this perspective, contrary to Commerce's contention, there was no failure of consideration for the rent abatement.

Commerce's analysis on the second project is, if anything, even worse than the first. The second project concerned the "clean up and removal of asbestos from the buildings" that the Province leased to Valbruna. Commerce explained, in its Final Determination, that – under Italian law – where an employer leases (rather than owns) a facility with an asbestos hazard, "the company could, as the tenant, request [*i.e.*, require] that the landlord undertake the asbestos removal." Final Determination, 63 Fed. Reg. at 40,485.

Commerce nevertheless concluded that, in this case, the Province (*i.e.*, the landlord/lessor) had no responsibility for the removal of asbestos from the buildings it leased to Valbruna, "because [Valbruna] had assumed the obligation under the lease." As Commerce summed up its rationale:

> [S]ince Valbruna agreed to assume the obligation for extraordinary maintenance under the lease, the company would have no means of requiring the owner to do the repairs [*i.e.*, the asbestos removal]. Thus, the Province agreed to forgo revenue in order to have the asbestos problem addressed even though it would not have been its responsibility to pay for [the work].

Final Determination, 63 Fed. Reg. at 40,485.

On its face, that logic seems utterly circular.[40] Commerce seemingly points to the *result* of

_____

[40]Commerce's verification report includes the same circular logic. *See* Pub. Doc. No. 218 at 9; Valbruna Brief at 27-28. The Government's brief simply recites that same logic, and made no attempt to refute the characterization of Commerce's reasoning as "circular." *See* Gov't Response Brief at 59; Valbruna Reply Brief at 3-4.

the negotiations between the Province and Valbruna – *i.e.*, the Lease Agreement itself (including the provision under which Valbruna assumes the Province's responsibility for certain initial extraordinary maintenance projects) – as proof that the Province never had responsibility for those projects in the first place. *See* Valbruna Brief at 26-28; Valbruna Reply Brief at 3-5.

It is perhaps telling that the Government's brief makes no attempt to respond to the claim that Commerce's rationale is circular. For its part, AL Tech makes a valiant effort to dress up the agency's reasoning.[41] But you can't put lipstick on a pig.

_____

[41]AL Tech and the Government both attempt to "backfill" Commerce's determination with impermissible *post hoc* rationale.

For example, AL Tech points to statements in the record suggesting that the asbestos levels in the buildings on the Industrial Site were within legal limits. *See* AL Tech Response Brief at 9-10; *but see* Valbruna Reply Brief at 11-13. Even if true, Commerce plainly did not rely on the relative levels of asbestos contamination as a basis for its Final Determination.

AL Tech also attempts to argue that Valbruna was responsible for the furnace encapsulation project as "successor-in-interest" to Bolzano. *See* AL Tech Response Brief at 13-15. However, that theory too was not relied on by Commerce as a basis for its Final Determination; nor does it find any evidentiary basis in the record. (Moreover, although the record is silent on the matter, it seems likely that Valbruna would (at most) have become successor-in-interest to Bolzano the steelmaker, and that *the Province* would have been deemed "successor-in-interest" to Bolzano the property owner.)

Similarly, both AL Tech and the Government make the claim that – as the Government puts it – in granting the two-year rent abatement, "commercial considerations were eclipsed by other social and political factors" (*i.e.*, the Province's concern with ensuring the continued employment of workers). *See* Gov't Response Brief at 56-57; AL Tech Response Brief at 17-18. But, yet again, Commerce made no mention of that factor in its Final Determination. *See generally* Valbruna Reply Brief at 7-8.

Finally, in its brief, the Government makes the claim that "it was highly unlikely that a commercial landlord would have entered into the lease with Valbruna at all, much less granted a two-year rent exemption for environmental remediation projects that related mainly to the modification of buildings on the Bolzano site – buildings that an ordinary commercial landlord, and even the Province itself, would have demolished, but for the Province's desire to maintain employment at the steel works, and to have steel-related environmental reclamation projects

If the logic of Commerce's determination on Valbruna's two-year rent abatement is as fundamentally flawed as it appears to be, that determination is both unsupported by the evidence and not in accordance with law. However, there remains at least a remote possibility that the problem lies not in the logic of the agency's determination but, rather, in its expression.

Given these unusual circumstances, it is appropriate to remand this issue, to accord Commerce an opportunity to reconsider its determination and to fully articulate the rationale for that determination, taking into consideration the record evidence as well as all parties' arguments, both at the administrative level and in this forum.

### b. Valbruna's Proposed Adjustment for Its Assumption of Future Extraordinary Maintenance Expenses

In addition to challenging Commerce's treatment of the rent abatement it negotiated in exchange for its assumption of the Province's responsibility for initial extraordinary maintenance and environmental remediation, Valbruna/Bolzano also contests the agency's refusal to make an adjustment for Valbruna's assumption of responsibility for ongoing extraordinary maintenance under the Lease Agreement. *See* Final Determination, 63 Fed. Reg. at 40,484; Valbruna Brief at 31-37; Valbruna Reply Brief at 16-21. *But see* Gov't Response Brief at 53-55; AL Tech Response Brief at 19-22.

---

undertaken." Gov't Response Brief at 58. In essence, the Government attempts to argue that the Province's decision to lease the Industrial Site to Valbruna was unreasonable. But, clearly, Commerce made no such finding in its Final Determination. Indeed, Commerce implicitly found that the Province acted reasonably in deciding to rent the land and buildings to Valbruna (although Commerce also found that the rent to be paid was insufficient). *See generally* Valbruna Reply Brief at 7-8.

Valbruna/Bolzano asserts that the 5.7% benchmark rate used in Commerce's "adequate

remuneration" analysis assumes that the landlord/lessor bears responsibility for extraordinary

maintenance, in accordance with Italian law. However, under the specific terms of the Lease

Agreement here, Valbruna assumed that responsibility. Thus, according to Valbruna/Bolzano,

Commerce's failure to make an appropriate adjustment effectively ignores the bargained-for

reallocation of responsibility for extraordinary maintenance negotiated between the Province and

Valbruna.[42] *See* Valbruna Brief at 31-37; Valbruna Reply Brief at 16-21.

In its Final Determination, Commerce set forth the bases for its refusal to make an adjustment

for Valbruna's assumption of responsibility for ongoing extraordinary maintenance over the life of

its 30-year lease:[43]

> [T]he record evidence demonstrates that although the Italian Civil Code obliges the
> landlord to pay for extraordinary maintenance, this obligation may be borne by the
> lessee if specified in the lease. In particular, we learned at verification that long-term
> leases often oblige the lessee to bear responsibility for these costs because of the
> long-term costs involved. The [lease for the Industrial Site] is for a period of 30
> years, the maximum allowed under Italian law. Thus, the terms of this particular
> contract are such that a commercial landlord most likely would have assigned this
> obligation to the tenant. Further, the obligation would be factored into the lease rate.
> To the extent that [Valbruna] may face an additional financial obligation than other

---

[42]All parties agree (1) that, under Italian law, the landlord/lessor bears the responsibility for
extraordinary maintenance; (2) that, under Italian law, the parties may reallocate that responsibility;
and (3) that, in the Lease Agreement, Valbruna and the Province did so here. *See* Prop. Doc. No.
50, Ex.9; Pub. Doc. No. 223 at 3; Valbruna Brief at 34; Valbruna Reply Brief at 16-17; Gov't
Response Brief at 53-55; AL Tech Response Brief at 19-22.

[43]As with depreciation (discussed in section II.B.2.c below), the record suggests that
Commerce initially intended to make an adjustment for Valbruna's assumption of responsibility for
ongoing extraordinary maintenance. In its Preliminary Determination, Commerce stated that it "did
not have the information to calculate an adjustment to [its] benchmark for the cost of extraordinary
maintenance," but that it planned to examine the issue for its Final Determination. *See* Preliminary
Determination, 63 Fed. Reg. at 822.

parties because of extraordinary maintenance, that is balanced by the fact that [Valbruna's] lease term is much longer than the norm. Therefore, the [5.7%] average rate of return is an appropriate benchmark without any adjustments . . . .

Final Determination, 63 Fed. Reg. at 40,484.

Implicit in Commerce's reasoning are at least two findings: (1) a finding that the 5.7% benchmark rate reflects an allocation of responsibility for extraordinary maintenance to the lessee; and (2) a finding that the 5.7% rate would remain unaffected even if the lessee's liability for extraordinary maintenance was for a term of 30 years (rather than the 10-year term on which the 5.7% rate is apparently based). *See* Commercial Experts Report, Pub. Doc. No. 223 at 2 (Gabetti officials explain that "typical rate of return [is] 5.7 percent" and that "leasing of industrial land is normally for ten years"). Neither of these two "findings" finds support in the record.

As Valbruna/Bolzano observes, the REAG study expressly states that its "average" rate is based on standard contract terms, before any reallocation of rights and responsibilities by the lessor and the lessee on matters such as liability for ongoing extraordinary maintenance. Because the REAG basic rate reflects the lessor's retention of liability for such maintenance, the REAG study makes an adjustment for Valbruna's assumption of that responsibility under its Lease Agreement with the Province.[44] *See* Prop. Doc. No. 44, Att. 1, Letter 2. *See generally* Valbruna Response Brief at 32 n.18, 42; Valbruna Reply Brief at 20-21.

---

[44]One of Commerce's key reasons for deciding against the REAG rate as its benchmark was that the basic REAG rate reflected lease terms different than those of Valbruna's Lease Agreement with the Province – including, *inter alia*, Valbruna's assumption of responsibility for ongoing extraordinary maintenance. *See generally* Gov't Response Brief at 49. If that lease term was significant enough to serve as a basis for rejecting the REAG rate, it logically stands to reason that it may have a significant impact on rent (the lease rate).

In contrast, the evidentiary record here is, at best, ambiguous as to the contract terms that underpin Commerce's 5.7% benchmark rate. The Final Determination states merely that the 5.7% rate "reflects different terms, lengths, and locations of lease contracts throughout Italy." Final Determination, 63 Fed. Reg. at 40,484. And the Commercial Experts Report on which the Final Determination relies states simply that the 5.7% rate is "typical" for industrial sites near Rome but is "an average that could be applied throughout Italy," and that "leasing of industrial land is normally for ten years."[45] Unlike the REAG study, the Commercial Experts Report fails to specify whether the 5.7% rate assumes that responsibility for extraordinary maintenance is borne by the lessor or by the lessee.[46]

───────────────

[45]The Commercial Experts Report includes a brief discussion of the allocation of responsibility for extraordinary maintenance between lessors and lessees. However, it is a general discussion of typical practices, rather than a description of the specific assumptions underpinning the 5.7% rate. *See* Commercial Experts Report, Pub. Doc. No. 223 at 2-3. Indeed, the report's discussions of the two topics are separated by a paragraph summarizing purchase-leaseback transactions in Italy.

[46]Valbruna/Bolzano contends that "[t]he only reasonable inference to draw on the basis of the record developed by [Commerce] is that the 5.7% benchmark rate, like the REAG rate, reflects the standard allocation of rights and responsibilities between landlord and tenant" – *i.e.*, that the 5.7% rate assumes that the lessor bears responsibility for ongoing extraordinary maintenance, so that Valbruna/Bolzano is entitled to an adjustment. *See* Valbruna Reply Brief at 21; *see also id*. at 18-19.

On this record, however, nothing can be ruled out. It is thus also possible that the 5.7% benchmark rate assumes that the *lessee* bears responsibility for extraordinary maintenance – in which case Valbruna/Bolzano concedes that no adjustment would be necessary. *See* Valbruna Reply Brief at 17. And there is at least one other possibility. The Commercial Experts Report refers to the 5.7% rate as an "average." *See* Commercial Experts Report, Pub. Doc. No. 223 at 2. It is at least conceivable that the 5.7% rate reflects an "average" of rates for both leases in which the lessee assumes responsibility for extraordinary maintenance *and* leases in which the lessor retains it.

As an aside, it is also worth noting that – although the Final Determination asserts that, "[a]s an average," the 5.7% benchmark rate "reflects different [contract] terms, lengths, and locations of lease contracts throughout Italy" – that statement is not clearly supported by the record. Final

Moreover, even if one were inclined to strain to read the two separate sections of the Commercial Experts Report (addressing the 5.7% rate on the one hand, and typical practices concerning extraordinary maintenance on the other) as indicating – however inartfully – that the 5.7% rate reflects an allocation of responsibility for extraordinary maintenance to the lessee, the report would nevertheless fail to address the effect – if any – on the 5.7% rate if the lessee were to assume that responsibility for a term of 30 years (rather than the 10-year term that the 5.7% rate apparently contemplates). The record is simply silent on the subject.[47]

---

Determination, 63 Fed. Reg. at 40,484. Parsing the relevant language of the Commercial Experts Report, it is unclear which particular variables are reflected in Gabetti's "average" – specific contract terms, lengths of leases, locations of property throughout the country, etc. Property location seems the most straightforward; that is, it seems relatively clear from the language of the report that Gabetti believes that the 5.7% rate can fairly be used for locations across the country. In this sense, perhaps, the rate reflects an "average" of "locations of lease contracts throughout Italy" (although, even so, it is not clear that the 5.7% rate was truly *calculated* as a nationwide "average" of varying rates from across the country). The basis for Commerce's representations in the Final Determination as to the relationship between the 5.7% rate and the length of the lease is less clear. As discussed elsewhere, it seems as though the 5.7% rate proffered by Gabetti assumes a 10-year lease, and is thus not an "average" of "different . . . lengths" of leases. But there may be room for doubt. On the other hand, the report's discussion of the 5.7% rate as an "average" is entirely silent on specific contract terms (such as the allocation of responsibility for extraordinary maintenance). It is therefore difficult to fathom – at least from the record – the basis for Commerce's statement in the Final Determination that the 5.7% rate reflects an "average" of "different [contract] terms."

[47]As the Final Determination emphasizes, a 30-year lease is "the maximum allowed under Italian law." Final Determination, 63 Fed. Reg. at 40,484. According to the Commercial Experts Report, a typical industrial lease in Italy has a term of only ten years. A 30-year lease is apparently very unusual – "more like a bank loan than a lease." *See* Commercial Experts Report, Pub. Doc. No. 223 at 2.

The parties speculated wildly – in their briefs and in oral argument – about the effect of the 30-year term of the Lease Agreement here, and whether such a long lease benefits the lessor or the lessee. *See, e.g.*, Valbruna Brief at 37; AL Tech Response Brief at 22. But that debate is largely *post hoc* rationalization, unsupported by the record. *See generally* Burlington Truck Lines, Inc., 371 U.S. at 168-69.

In short, the bottom line is that, unless Commerce's 5.7% benchmark rate reflects essentially the same basic terms as the Lease Agreement between Valbruna and the Province, appropriate adjustments are required. Accordingly, this issue must be remanded to Commerce as well, to permit the agency to clarify the assumptions on which its 5.7% benchmark rate is based, and – if necessary – to make the appropriate adjustments.

------

Vis-a-vis liability for extraordinary maintenance, Commerce's Final Determination implicitly concedes that the 30-year term imposes on Valbruna "an additional financial obligation" above and beyond that borne by the typical lessee. However, the Final Determination asserts that Valbruna's additional financial burden "is balanced by the fact that [its] lease term is much longer than the norm." *See* Final Determination, 63 Fed. Reg. at 40,484. In essence, Commerce concludes that any atypical extraordinary maintenance expense attributable to the 30-year term of the lease is fully offset by some unstated benefit to Valbruna that flows from the extended term of the lease. There is no record support whatsoever for that conclusion. *See generally* Valbruna Reply Brief at 19-20.

The record here is utterly devoid of evidence on the implications of the exceptional term of the Lease Agreement at bar, for issues such as the reasonableness of the 5.7% benchmark rate and Valbruna's assumption of responsibility for ongoing extraordinary maintenance over the life of the 30-year lease. On remand, Commerce will have the opportunity to clarify – and, if appropriate, supplement – the record on this point.

Indeed, considerations such as those discussed above implicitly cast doubt on Commerce's use of the "typical" Italian 5.7% rate (which is based on a 10-year lease) as the benchmark for a lease that is three times longer – definitely "not a normal leasing term," according to Gabetti. *See* Commercial Experts Report, Pub. Doc. No. 223 at 2. Accordingly, on remand, Commerce may even choose to fundamentally reconsider the wisdom of its use of the 5.7% rate as the benchmark for the Lease Agreement here at issue. *See*, *e.g.*, Valbruna Brief at 36-37 (querying whether Commerce's use of 5.7% rate based on a normal lease term of 10 years as a benchmark for a 30-year lease is supported by "substantial evidence on the record"); Valbruna Reply Brief at 18-19 ("There is nothing on the record to suggest that [Commerce's] 5.7% benchmark took into consideration the exceptional 30-year lease.").

### c. Valbruna's Proposed Adjustment for the Depreciation of Buildings

Just as Valbruna/Bolzano contends that Commerce should have factored in its assumption of extraordinary maintenance expenses in determining the adequacy of remuneration under Valbruna's Lease Agreement with the Province, so too Valbruna/Bolzano faults Commerce's failure to take into account the depreciation of the buildings covered by the Lease Agreement. *See* Final Determination, 63 Fed. Reg. at 40,484; Valbruna Brief at 38-39; Valbruna Reply Brief at 22-24.[48] *But see* Gov't Response Brief at 50-53; AL Tech Response Brief at 22-24.

As set forth in its Final Determination, Commerce's rationale for refusing to make an adjustment for depreciation spans but two sentences: "First, we verified that the buildings covered by the lease are very old. Given the age of the structures, we have not adjusted the rate . . . to reflect the depreciation of the structures because the likely useful life remaining would be relatively short."[49]

_____

[48]The Government makes a half-hearted, one-sentence argument that Valbruna/Bolzano's challenge on this point is barred because it assertedly failed to exhaust its administrative remedies. *See* Gov't Response Brief at 50. However, as explained in note 28 above, a party's failure to exhaust its administrative remedies is excused as to issues that "Commerce in fact considered." Timken Co. v. United States, 26 CIT ___, 240 F. Supp. 2d 1228, 1238 (2002), *quoting* FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT 74, 82, 131 F. Supp. 2d 104, 114 (2001). That exception applies here.

Valbruna/Bolzano raised the depreciation issue at the administrative level in the context of its argument urging Commerce to adopt the REAG rate (with adjustments) as the benchmark rate for the agency's evaluation of the Lease Agreement. Specifically, Valbruna/Bolzano advocated adjustment of the REAG rate to reflect, *inter alia*, the remaining depreciable life of the buildings on the Industrial Site. *See* Valbruna Reply Brief at 22 (*citing* Prop. Doc. No. 44, Att. 1, Letter 1 at 6-8); Case Brief of Acciaierie Valbruna SRL, Pub. Doc. No. 225 at 12-14. In its Final Determination, Commerce stated that it had considered Valbruna/Bolzano's depreciation argument. *See* Final Determination, 63 Fed. Reg. at 40,484 (stating that Commerce reconsidered, *inter alia*, the benchmark rate issue and the depreciation issue in light of "comments submitted by the parties").

[49]In this quoted excerpt from the Final Determination, Commerce actually states that it "has not adjusted the rate *upward* to reflect depreciation." (Emphasis added.) However, read in the

Final Determination, 63 Fed. Reg. at 40,484.

To be sure, the record supports Commerce's finding that the buildings on the Industrial Site are old. Record evidence indicates that most of the buildings were constructed between 1935 and 1940. *See* Prop. Doc. No. 44, Att. 1, Letter 1 at 6-7; Pub. Doc. No. 168 at 6. But the age of the buildings alone does not – in and of itself – establish that they have no remaining depreciable life. As Valbruna/Bolzano argues, the depreciable life of even an old building can be extended by measures such as renovation, re-roofing, or other improvements. *See* Tr. at 21.

In any event, for whatever reason, Commerce here failed to complete an analysis of the buildings' depreciable life.[50] Indeed, Commerce actually did not even conclude that the buildings had no remaining depreciable life. To the contrary, as noted above, in declining to consider an adjustment for depreciation, Commerce simply asserted that the buildings' "*likely* useful life remaining *would be relatively short*." Final Determination, 63 Fed. Reg. at 40,484 (emphasis added). Viewed in the light most favorable to Valbruna/Bolzano, that conclusory statement effectively concedes both that the buildings probably had *some* remaining useful life (albeit "relatively short," in Commerce's view), and that the buildings' future useful life potentially could

_____

context of the rest of that section of the agency's analysis, it seems clear that the excerpt is referring to the *benchmark rate* – in which case Commerce actually meant to say "downward." Alternatively, Commerce conceivably could have been referring to the *lease rate* – in which case "upward" would make sense.

[50]As with ongoing extraordinary maintenance (discussed in section II.B.2.b above), the record reflects that Commerce initially intended to make an adjustment for depreciation. In its Preliminary Determination, Commerce stated that it "would have made an adjustment to account for the depreciation of the buildings," but that it did not yet have all the information required for the analysis. *See* Preliminary Determination, 63 Fed. Reg. at 822.

be much longer.

Seizing on the age of these buildings and other record evidence indicating that the normal useful life of buildings is 40 to 50 years, the Government argues that it was reasonable for Commerce to refuse to make the requested adjustment, because any depreciable value was extinguished sometime between 1975 and 1990. The Government further asserts that any remaining depreciation would have been insignificant over the 30-year term of Valbruna's Lease Agreement.[51] *See* Gov't Response Brief at 51-52; Prop. Doc. No. 51 at 12.

However, *post hoc* rationalization by litigation counsel is no substitute for an agency's reasoned analysis on the record. *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (agency action "[to] be upheld, if at all, on the same basis articulated by the agency itself") (citation omitted). Moreover, the Government's argument is directly contravened by record evidence that Valbruna/Bolzano cites, which suggests that the buildings in fact may have significant useful life remaining. *See* Prop. Doc. No. 44, Att. 1, Letter 1 at 6-7; Prop. Doc. No. 6, App. 6c; Prop. Doc. No. 14 at 000097. *But see* Gov't Response Brief at 51-53; AL Tech Response Brief at 23-24.

Particularly in light of the evidence to which Valbruno/Bolzano points, Commerce's finding that the buildings are "very old" cannot be linked to a conclusion that an adjustment for depreciation is not warranted, absent further analysis by the agency. *See* Final Determination, 63 Fed. Reg. at

---

[51]As discussed above, the overall subsidy rate at issue here is 1.28% – a rate only marginally above the statutory *de minimis* threshold of one percent. Particularly given the number of challenges to various aspects of Commerce's Final Determination in this case, it is therefore dangerous to cavalierly dismiss out of hand as "insignificant" *any* consideration that might have the effect of lowering the overall subsidy rate, because a handful of otherwise arguably "insignificant" factors could – cumulatively – reduce the subsidy rate below the *de minimis* threshold.

40,484. And, without the benefit of further analysis, Commerce's reasoning cannot be upheld as supported by substantial evidence.

Accordingly, this issue too must be remanded to Commerce, to permit the agency to reach and explain a conclusion consistent with the evidentiary record.

### C. Commerce's Determination That Various Government Programs Conferred Subsidies

Valbruna/Bolzano's final assault is on Commerce's findings that countervailable subsidies were conferred by assistance received under three government programs – Law 25/81, Law 193/84, and the European Social Fund. According to Commerce, aid under these three programs benefitted Valbruna/Bolzano at subsidy rates totaling 0.47%. *See* Final Determination, 63 Fed. Reg. at 40,479, 40,485-88.

In essence, Valbruna/Bolzano contends that the government assistance provided under the three programs at issue was either (1) repaid, (2) not allocable to the merchandise at issue here, or (3) generally available – that is, not "specific" – and therefore not countervailable.[52] *See generally* Valbruna Brief at 40-60; Valbruna Reply Brief at 24-46. *But see* Gov't Response Brief at 19-21, 60-78; AL Tech Response Brief at 25-45.

In each instance, Valbruna/Bolzano's arguments warrant remand.

---

[52]In addition, Valbruna/Bolzano challenges Commerce's "pass-through" determinations as to assistance provided under Law 25/81 and Law 193/84. However, that issue is presently on remand to Commerce, and has been stayed.

## 1. Law 25/81 Aid

_____Valbruna/Bolzano challenges Commerce's determination that – even though the aid had been repaid in full by Falck – certain restructuring assistance and long-term, low interest loans made under Provincial Law 25/81[53] to Bolzano between 1983 and 1992 (while it was a subsidiary of Falck) conferred a countervailable subsidy. *See* Valbruna Brief at 40-50; Valbruna Reply Brief at 24-27; Final Determination, 63 Fed. Reg. at 40,485-86. Commerce assessed a countervailing duty rate of 0.28 %. Final Determination, 63 Fed. Reg. at 40,486.

In its Final Determination, Commerce acknowledged a 1996 determination by the European Commission ("EC") that the Law 25/81 aid to Bolzano was illegal. Commerce even conceded that Falck had "effectively repaid" the aid, as the EC had ordered.[54]  *See* Final Determination, 63 Fed. Reg. at 40,486. Commerce nevertheless ignored that repayment in its countervailing duty analysis, asserting that – because Falck was appealing the EC's order before the Court of First Instance of the European Communities – the repayment was not legally "final" and was "likely [to] remain unresolved for a number of years." Final Determination, 63 Fed. Reg. at 40,491.[55]

---

[53]Law 25/81 provides for financial assistance from the Province to companies to support advanced technology, environmental investment, and restructuring projects.

[54]As explained in section I above, Falck sold Bolzano to Valbruna in 1995. As part of the Share Transfer Agreement, Falck retained both liability for repayment and the right to challenge any decision requiring repayment. *See* Final Determination, 63 Fed. Reg. at 40,486; Share Transfer Agreement, Prop. Doc. No. 9, App. F-1 at Art. 8.01.

The EC's decision required repayment of all Law 25/81 restructuring assistance and loans received by Bolzano, except aid approved before January 1, 1986. *See* Final Determination, 63 Fed. Reg. at 40,486.

[55]Commerce stated that, once a final judgment was rendered in Falck's appeal, the issue could be reconsidered in an administrative review, if appropriate. Final Determination, 63 Fed. Reg. at

Valbruna/Bolzano argues, in a nutshell, that Commerce's treatment of the Law 25/81 aid to Bolzano (including Falck's repayment) is inconsistent with the countervailing duty statute, prior case law, and agency practice. *See generally* Valbruna Brief at 38-45; Valbruna Reply Brief at 31-34. For their part, the Government and AL Tech maintain that Commerce properly refused to consider the effect of Falck's repayment, in light of Falck's then-pending appeal. *See generally* Gov't Response Brief at 60-65; AL Tech Response Brief at 28-30.

Whatever the merits of the parties' positions, much of their argument has been rendered academic. A final, non-appealable judgment affirming the decision of the Court of First Instance and denying Falck's appeal of the EC's repayment order has been issued by the European Court of Justice ("ECJ"). *See* Letter to Court from counsel for Valbruna/Bolzano (filed March 21, 2003) (enclosing Attachment 1, analyzing the ECJ decision). The matter is now conclusively settled. The repayment stands.

Indeed, in a determination that Commerce issued in a related administrative proceeding, the agency found – based on the denial of Falck's *initial* appeal by the Court of First Instance, even before the judgment in Falck's second and final appeal (*i.e.*, its appeal to the ECJ) – that, "given the diminished prospects for Falck to recover the amount it had repaid, there was no benefit to Bolzano or Valbruna from the grants and loans received under [Law 25/81] after January 1, 1986." Accordingly, Commerce there concluded that only the aid provided to Bolzano prior to January 1986 is countervailable. *See* <u>Stainless Steel Wire Rod from Italy</u>, 67 Fed. Reg. 39,357, 39,360 (June 7,

_____

40,491.

2002); <u>Stainless Steel Wire Rod from Italy</u>, 67 Fed. Reg. 63,619 (Oct. 15, 2002). *See also* n. 6, *supra*.

The Government nevertheless continues to oppose remanding the issue to allow the agency to reconsider its position in light of these developments. The Government invokes the general principle that the scope of the administrative record for purposes of judicial review is limited to that information which was before the agency at the time it rendered its decision. *See* Defendant's Response to the Court's Questions of March 6, 2003 (filed March 20, 2003) (*quoting* <u>Kerr-Mcgee Chem. Corp. v. United States</u>, 21 CIT 11, 18, 955 F. Supp. 1466, 1472 (1977)).

However, the Government's proposed course of action would amount to turning a blind eye to the now certain fact that the aid at issue has been – as Commerce itself found in its Final Determination here – "effectively repaid." <u>Final Determination</u>, 63 Fed. Reg. at 40,486. True, many agency decisions are inherently predictive. But to require the judiciary to *categorically* ignore all events that occur after an agency determination (no matter how direct their bearing on the agency's predictions) would be to risk "convert[ing] the reviewing process into an artificial game."[56] <u>Amoco</u>

---

[56]Attempting to characterize this issue for analytical purposes rapidly becomes an exercise in metaphysics. It is not clear, for example, that the issuance of a decision by a legal tribunal constitutes an "event" – at least not in the same sense that the term is typically used to refer to "subsequent events" (*i.e.*, factual developments that post-date an agency's action).

Nor is it even clear that what is at issue here was, in fact, "subsequent." In other words, there was nothing "subsequent" about either the law that necessitated repayment of the Law 25/81 aid, or Falck's repayment of that aid. Specifically, the law on which the EC relied to require repayment of the Law 25/81 aid was itself already in existence at the time of Commerce's Final Determination – even if there had not yet been a final, non-appealable judicial determination on its application to Falck. And, as discussed above, Commerce itself conceded in its Final Determination that Falck in fact had already made repayment.

Oil Co. v. E.P.A, 501 F.2d 722, 730 (D.C. Cir. 1974).  Thus, while the Government points to an important principle guiding judicial review of agency decisions, it is no ironclad rule.

As the courts have recognized over the years, it is necessary in certain circumstances to supplement the administrative record "to preserve . . . meaningful judicial review."  Rust Constructors Inc. v. United States, 49 Fed. Cl. 490, 496 (2001) (quotations omitted).  That is particularly true where – as here – evidence coming to light after an agency's decision shows whether that decision was correct or not.  *See* Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir. 1989) (listing circumstances when it is appropriate to supplement the administrative record); Leboeuf, Lamb, Greene & Macrae, LLP v. Abraham, 215 F. Supp. 2d 73, 82 (D.D.C. 2002) (admitting evidence arising after agency action that showed the correctness of the agency's decision).[57]

Moreover, to ignore the ECJ ruling in this case would undermine an important policy of the antidumping and countervailing duty laws – calculating antidumping and countervailing duties accurately.  *Cf.* Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (the "basic purpose" of the antidumping statute is to calculate duties "as accurately as possible").  If Falck's repayment of the Law 25/81 aid means that no benefit was conferred, to countervail that aid would violate both the spirit *and* the letter of the law.  *See* 19 U.S.C. § 1677(5)(A)-(B) (defining a countervailable subsidy as one that confers a benefit on the recipient).  In other words, it is now certain that failure to consider Falck's repayment could result in countervailing duties being levied against a company that did not benefit from a legally cognizable subsidy – a clearly unlawful result.

---

[57]*See also*, *e.g.*, Welch v. U.S. Air Force, 249 F. Supp. 2d 797, 810 (N.D. Tex. 2003); ITT Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 185 (1999).

Accordingly, this matter must be remanded to Commerce so that the agency may reconsider its treatment of the Law 25/81 aid in light of the repayment of that aid, as well as any other related issues.[58]

## 2. Law 193/84 Aid

Valbruna/Bolzano mounts two distinct attacks on Commerce's determination that certain "capacity reduction" grants received by Falck and Valbruna under Law 193/84 conferred a countervailable subsidy. Valbruna/Bolzano first asserts that the agency erred in attributing those grants to the merchandise subject to the investigation at issue here. *See* Valbruna Brief at 50-53. *But see* Gov't Response Brief at 15-19; AL Tech Response Brief at 35-38. In the alternative, Valbruna/Bolzano argues that Commerce erred in combining benefits received under two programs under Law 193/84 before performing its "small grants test," with the result that the benefits were not expensed in year of receipt (contrary to applicable regulations). *See* Valbruna Brief at 50-53; Valbruna Reply Brief at 37-41. *But see* Gov't Response Brief at 19-21; AL Tech Response Brief

---

[58]In addition to its repayment argument, Valbruna/Bolzano advances a second challenge to Commerce's determination on the treatment of the Law 25/81 aid to Bolzano. According to Valbruna/Bolzano, Commerce erred in determining that any subsidy under Law 25/81 was *de facto* "specific" (and thus countervailable) within the meaning of the statute. *See* Valbruna Brief at 39-40, 45-50; Valbruna Reply Brief at 24-31; 19 U.S.C. § 1677(5A)(D). However, the issue of *de facto* specificity depends on whether the Law 25/81 aid conferred a subsidy. Because remand of the repayment issue necessarily reopens the question of whether the Law 25/81 aid conferred a subsidy, *de facto* specificity is not now ripe for review.

On remand, Commerce will have the opportunity to reconsider its specificity determination, in light of its redetermination on the repayment issue (as well as any other relevant considerations).

at 38-40. For the Law 193/84 grants, Commerce calculated a subsidy rate of 0.14 %. *See generally* Final Determination, 63 Fed. Reg. at 40,479, 40,492.

As Commerce's Final Determination explains, Law 193/84 provides for grants to reduce steel output pursuant to Italy's obligations under the European Coal and Steel Community ("ECSC"). Both Falck and Valbruna received grants in 1985 and 1986 under Article 2 (covering ECSC steel production) and Article 4 (covering non-ECSC pipe and tube production) of that law. *See* Final Determination 63 Fed. Reg. at 40,479.

In a prior proceeding, Commerce determined that Law 193/84 "provides countervailable subsidies in the form of non-recurring grants to the private steel sector." Finding that "[n]o new information or evidence of changed circumstances [was] submitted in this proceeding," Commerce here declined to reconsider that earlier determination. *See* Final Determination, 63 Fed. Reg. at 40,479 (*citing* Certain Steel from Italy, 58 Fed. Reg. 37,327, 37,332-33 (Dep't Commerce, July 9, 1993) (final determination); *see also* Preliminary Determination, 63 Fed. Reg. at 816; Valbruna Brief at 50-51 & nn.118-19; Gov't Response Brief at 15.

Valbruna/Bolzano maintains that, in this case, Commerce violated its longstanding "tying" practice. Under that practice, if a subsidy is tied to the production or sale of a particular product, Commerce generally attributes the subsidy only to that product. *See* 19 C.F.R. § 351.525(b)(5). Valbruna/Bolzano emphasizes that Falck's production facilities that received the grants at issue never produced subject merchandise. *See* Valbruna Brief at 50-51.

But Commerce's "tying" practice does not apply in this case, because *plant closure assistance* is at issue. *See* Final Determination, 63 Fed. Reg. at 40,479. As explained in the Final

Determination, Commerce has found that – where plant closure assistance is involved – that aid benefits all of the subject company's operations.[59] Commerce reasons that, as one inefficient facility is closed, resources are freed up to benefit the production facilities that remain. Final Determination, 63 Fed. Reg. at 40,479 (*citing* Certain Steel Products from Austria (GIA), 58 Fed. Reg. at 37,269-70 (*citing* British Steel Corp. v. United States, 9 CIT 85, 605 F.Supp. 286 (1985) ("British Steel"))). Thus, Commerce's practice has been to treat all plant closure aid as countervailable – even if that aid is, ostensibly, aimed at non-subject merchandise. Final Determination, 63 Fed. Reg. at 40,479.[60]

Commerce's "tying" rationale in this case is consistent with its established practice of considering plant closure aid to be "untied" from particular merchandise; and Valbruna/Bolzano advances no compelling reason here to depart from prior case law upholding that practice.

Valbruna/Bolzano has somewhat greater success on its challenge to Commerce's determination to treat the grants provided to Falck under Article 2 and Article 4 of Law 193/84 as part of the same program for purposes of the agency's "small grants test."[61] The small grants test

_____

[59]Valbruna/Bolzano also argues that Commerce only deviates from its tying practice in cases, unlike this one, where the closure aid is received *after* the plant has already closed. Valbruna Brief at 52-53 & n.124(*citing* Steel Wire Rod from Canada, 62 Fed. Reg. 54,972, 54,981 (Dep't Commerce Oct. 22, 1997) (final determination)). To the contrary, Commerce has found that grants received both *before and after* closure of the facilities in question benefit the remaining production facilities. *See* Steel Wire Rod From Canada, 62 Fed. Reg. at 54,980.

[60]Indeed, the Court of International Trade upheld Commerce's rationale in British Steel, where it found that "[a]s a company becomes more cost efficient and thereby more price competitive, there is a direct benefit to the manufacture, production, or export of *all the firm's products*." British Steel, 9 CIT at 95, 605 F. Supp. at 293 (emphasis added).

[61]The Government raises two procedural objections to Valbruna/Bolzano's small grants argument. First, the Government criticizes Valbruna/Bolzano because it failed to raise the issue in briefing during the administrative proceedings. *See* Gov't Response Brief at 19 n.6. The short answer to the Government's point is that Valbruna/Bolzano had no reason to raise the issue earlier,

carves out an exception to Commerce's general practice of allocating non-recurring aid to a firm over the number of years corresponding to the average useful life of renewable physical assets. 19 C.F.R. § 351.524(b)(1). Rather than allocating non-recurring benefits over a number of years, the exception allows Commerce to allocate the aid in the year it is received *if* the "total amount approved under the subsidy program is less than 0.5 percent of relevant sales." 19 C.F.R. § 351.524(b)(2).

If Commerce treats Article 2 and Article 4 as separate programs, the aid that Falck received will be allocated to the year in which it was received, rendering it – in this case – non-countervailable. But, because Commerce here combined aid from Articles 2 and 4, the funds distributed to Falck exceeded the 0.5% threshold of the small grants test. The aid was therefore allocated over a number of years, and found to be countervailable. *See generally* Valbruna Brief at 54; Valbruna Reply Brief at 39.

Commerce's treatment of Article 2 and Article 4 aid as part of a single program may reflect a reasonable agency interpretation of the governing statute, the relevant regulations, and the evidence of record in this matter. However, there is no simply no way of knowing. Commerce has failed to articulate the reasoning behind its decision. *See* Final Determination, 63 Fed. Reg. at 40,479.

---

because Commerce had not combined the grants under the two articles in its Preliminary Determination. *See* Preliminary Determination, 63 Fed. Reg. at 825-26. The doctrine of exhaustion requires only that parties be timely, not clairvoyant.

The Government also claims that Valbruna/Bolzano improperly raised this issue in a letter alleging a ministerial error. *See* Gov't Response Brief at 19 n.6. That argument fails as well. Raising such an issue in a letter within five days after the Final Determination, as Valbruna/Bolzano did, is the appropriate mechanism to address ministerial error, pursuant to 19 C.F.R. § 351.224. And Commerce has considered similar issues to be ministerial in the past. *See*, *e.g.*, Fabrique de Fer de Charleroi, SA v. United States, 25 CIT 567, 581, 166 F. Supp. 2d 593, 607 (2001).

AL Tech tries to bridge the gap by arguing that Commerce has consistently treated all aid under Law 193/84 as part of a single program. *See* AL Tech Response Brief at 39 (*citing* Certain Steel Products From Italy, 58 Fed. Reg. at 37,327, 37,332-33 (Dep't Commerce July 9, 1993) (final determination); Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe ("Seamless Pipe") From Italy, 60 Fed. Reg. 31,992, 31,996 (Dep't Commerce June 19, 1995) (final determination); Oil Country Tubular Goods From Italy, 60 Fed. Reg. 33,577, 33,580 (Dep't Commerce June 28, 1995) (final determination)). The Government chimes in that the language of the applicable regulation indicates that the small grants test is to be applied to all benefits associated with Law 193/84, not just each individual benefit. *See* Gov't Response Brief at 20.

However persuasive these arguments may be, they find no anchor in the agency's determination, and thus constitute impermissible *post-hoc* rationalization. *See* Burlington Truck Lines, Inc., 371 U.S. at 168-69. The explanations of counsel are no substitute for a reasoned and transparent agency determination.

Moreover, if Commerce's reasoning is opaque, its action is also somewhat inconsistent. While Commerce may have consistently treated all aid under Law 193/84 as a single program in the past, it does not appear to have done so here. *Cf.* AL Tech Response Brief at 39 & n.20 (and determinations cited there). Commerce treated aid under Article 3 of Law 193/84 as separate from aid under Articles 2 and 4 for purposes of the small grants test.[62] *See* Preliminary Determination,

---

[62]Commerce found that Valbruna's Article 3 aid amounted to less than 0.5 percent of total sales and therefore, "in accordance with its practice [*i.e.* the small grants test]," it allocated the aid to the year it was received. *See* Preliminary Determination, 63 Fed. Reg. at 825-26.

63 Fed. Reg. at 816, 825-26; Final Determination 63 Fed. Reg. at 40,479, 40,492. Further, Commerce's treatment of Article 2 and Article 4 aid as part of a single program under Law 193/84 differs – at least on its face – from its treatment of aid under Article 13 and Article 15 of Law 25/81. *See* section II.C.1, *supra*. There, finding that Articles 13 and 15 had, *inter alia*, different eligibility requirements and different application procedures, Commerce treated the aid received under Articles 13 and 15 as separate from the rest of Law 25/81 aid. *See* Final Determination, 63 Fed. Reg. at 40,485. Valbruna/Bolzano maintains that the separate eligibility requirements and application procedures for aid under Articles 2 and 4 suggest that Commerce should have reached the same conclusion here. *See* Valbruna Reply Brief at 37-41. Unfortunately, it is not possible to discern the agency's reasoning.

Accordingly, this matter must be remanded to Commerce, to permit it to reexamine and explain its application of the small grants test to the aid provided under Article 2 and Article 4 of Law 193/84.

### 3. European Social Fund Assistance

Valbruna/Bolzano's final volley targets Commerce's determination that certain benefits received by Valbruna and Bolzano under the European Social Fund ("ESF") are *de jure* specific, and thus constitute countervailable subsidies. At stake is Commerce's calculated subsidy rate of 0.05%. *See* Final Determination, 63 Fed. Reg. at 40,487-88, 40,492-93. *See generally* Valbruna Brief at 55-60; Valbruna Reply Brief at 41-46. *But see* Gov't Response Brief at 73-78; AL Tech Response Brief at 41-45.

As Commerce explained in its Final Determination, the ESF provides funding primarily for vocational training and employment assistance throughout the European Union ("EU"). At issue here is ESF Objective 4 (one of ESF objectives), which funds vocational training for employed workers in companies undergoing restructuring.[63]  Final Determination, 63 Fed. Reg. at 40,487.

The framework and budget for ESF Objective 4 projects are established in negotiations between the EU, the national governments, and regional authorities.  Final Determination, 63 Fed. Reg. at 40,487.  The negotiations result in a "Single Programming Document" ("SPD") for each country, setting forth broad goals for the ESF Objective 4 projects throughout the country, as well as the budget and specific goals for projects slated to be funded.  Final Determination, 63 Fed. Reg. at 40,487.  In addition to the funding for ESF Objective 4 projects provided by the EU, funds are also provided by national and regional governments.  This action concerns ESF Objective 4 funding at the EU and national (Italian) levels.[64]

Commerce determined that the *EU funding* provided under ESF Objective 4 in Italy is *de jure* specific within the meaning of the statute (as explained in greater detail below), finding that "it is limited on a regional basis to Italy."  *See* Final Determination, 63 Fed. Reg. at 40,487.  Similarly, Commerce determined that the *Italian funding* is *de jure* specific as well, finding that "it is limited

_____

[63]Commerce determined that, for purposes of its specificity analysis, ESF Objective 4 funding in Italy should be examined as a separate program, because of separate approval processes and a lack of budget transferability between Objectives.  Final Determination, 63 Fed. Reg. at 40,487.

[64]Where, as here, funding is provided at different jurisdictional levels, Commerce examines each level separately for purposes of determining whether the funding at that jurisdictional level is specific within the meaning of the statute.  *See* Final Determination, 63 Fed. Reg. at 40,487.

on a regional basis to the center and north of Italy." *See* <u>Final Determination</u>, 63 Fed. Reg. at 40,487. Valbruna/Bolzano contests both specificity determinations.

Commerce found that *EU funding* under ESF Objective 4 is "available throughout the Member States." <u>Final Determination</u>, 63 Fed. Reg. at 40,487. However, notwithstanding its finding that the EU provides ESF Objective 4 funds to *all countries in the EU*, Commerce concludes that EU ESF Objective 4 funding for Italy is "limited on a regional basis to Italy." <u>Final Determination</u>, 63 Fed. Reg. at 40,487.

Commerce's determination is marred by inadequate explanation and inconsistent reasoning. Although it is far from clear, it appears that Commerce predicated its conclusion that EU Objective 4 funding is "limited on a regional basis to Italy" on its finding that the EU negotiates with each individual country separate programming documents (*i.e.*, the SPDs) detailing the use of funds. However, Commerce fails to explain how negotiation of the SPDs effectively converts funds that are generally available throughout the EU into funds specific to individual countries.

Negotiation of the SPDs appears to be simply a means by which the EU ensures that the ESF funds are used to foster the EU's policy objectives. Indeed, the EU monitors the programs created pursuant to the SPDs throughout the EU once they are implemented. *See* Pub. Doc. No. 221 at 6. It is not obvious how funds that are available throughout the EU, for use in pursuing EU-wide policy objectives, become "limited on a regional basis" simply because the EU and a national government sit down to iron out details.

In support of its determination that EU funds are limited on a regional basis to Italy, Commerce – without explanation – relies on its determination in <u>Groundfish</u>. *See* <u>Final Determination</u>, 63 Fed. Reg. at 40,487 (*citing* <u>Certain Fresh Atlantic Groundfish From Canada</u>, 51

Fed. Reg. 10,041, 10,048 (Dep't Commerce March 24, 1986) (final determination) ("Groundfish")).

But Groundfish appears to be inapposite. The "programs" there at issue were not generally available

(*i.e.* throughout Canada), government-funded programs but, rather, only loose agreements between

the Canadian government and the provincial governments to cooperate in establishing and

administering joint programs in a variety of areas. Commerce there found that the individual

programs created under the agreements were *de jure* specific. *See* Groundfish, 51 Fed. Reg. at

10,066. Commerce's decision was based on the fact the Canadian government did not provide

funding for programs on a nation-wide basis.

In contrast, under ESF Objective 4, the EU provides funding for programs on a Europe-wide

basis. Indeed, Commerce itself drew this critical distinction in a determination in another proceeding

issued after its determination here. *See* Stainless Steel Plate in Coils From Italy, 64 Fed. Reg.

15,508, 15,516-17 (Dep't Commerce March 31, 1999) ("Steel Plate"). In Steel Plate, Commerce

observed that – unlike the programs in Groundfish – ESF Objective 4 funding is available throughout

the entirety of the EU. *See* Steel Plate, 64 Fed. Reg. at 15,516-17. Commerce even confessed in

Steel Plate that it erred *in this very proceeding*, candidly conceding that the agency might

appropriately "revisit its previous decision [*i.e.*, its determination in this case] regarding the *de jure*

specificity of assistance distributed under . . . ESF Objective 4 [funding] in Italy." Steel Plate, 64

Fed. Reg. at 15,516-17.

In sum, Commerce's determination that the EU Objective 4 funding is *de jure* specific is not

supported by adequate reasoned explanation. Moreover, what reasoning can be divined from the

Final Determination is at odds with record evidence, unsupported by the cited authority, and

inconsistent with the agency's own subsequent reasoning. Accordingly, this matter must be

remanded to Commerce to permit the agency to reconsider its analysis on the specificity of EU funding, and to clearly articulate the rationale for its determination.

Just as Commerce found that EU funding for ESF Objective 4 funding was *de jure* specific, so too it found *Italian funding* to be *de jure* specific. In particular, the agency found that Italian funding for ESF Objective 4 projects is "available in all areas of Italy except the ESF Objective 1 areas." Commerce concluded on that basis that Italian funding is *de jure* specific within the meaning of the statute, because it is "limited on a regional basis to the center and north of Italy." Final Determination, 63 Fed. Reg. at 40,487

Valbruna/Bolzano disputes that determination, arguing that Commerce ignored evidence that funding to carry out ESF Objective 4 goals is generally available throughout Italy, and that ESF Objective 4 funds are excluded only where ESF Objective 1 funding is already being used to implement the same goals. *See* Valbruna Brief at 59-60. AL Tech and the Government counter that ESF Objective 1 has broader goals than ESF Objective 4 and is administered by different authorities with separate approval processes and no budget transferability. *See* Gov't Response Brief at 77-78; AL Tech Response Brief at 44-45 & nn.32-34. Because Commerce analyzed ESF Objectives 1 and 4 separately, the agency's determination does not speak to whether, as a practical matter, some overlap exists between ESF Objective 4 and ESF Objective 1 projects.

In any event, Commerce's determination is undermined by the language of the specificity statute and the record before the agency, as well as the policy underlying the countervailing duty statute.

Commerce relies on a subsection of the statute defining as *de jure* specific "a subsidy [that] is *limited* to an enterprise or industry *within a designated geographical region* within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D)(iv) (emphasis added). "Designated" is defined as "to indicate or specify, point out." The American Heritage Dictionary of the English Language (4th Ed. 2000). Thus, the statute's placement of the qualifier "designated" before "geographic region" would seem to require some sort of an affirmative indication of a limitation to a specified geographical region, if a subsidy is to be considered *de jure* specific on that basis.

Commerce's analysis appears to ignore the adjective "designated," concluding that – since ESF Objective 4 funding is not provided in the south of the country – it is limited to the center and the north. But that reasoning is insufficient. Commerce fails to adequately explain how ESF Objective 4 funding is limited "within a *designated* geographical region" and therefore *de jure* specific.[65]

Commerce points to nothing in the record to indicate that ESF Objective 4 funding in Italy was subject to any *designated geographical* limitations. For example, it does not appear that the SPD negotiated between Italian officials and the EU reflected any such limitation. *See* Pub. Doc.

---

[65]Numerous agency determinations reflect Commerce's practice of finding *de jure* specificity under section 1677(5A)(D)(iv) when a geographic region is specifically designated. *See*, *e.g.*, Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 50,410 (Dep't Commerce Oct. 3, 2001) (final determination) (adopting Decision Memorandum) (assistance limited to outside the Bangkok metropolitan area); Fresh Atlantic Salmon from Chile, 62 Fed. Reg. 61,803, 61,806 (Dep't Commerce Nov. 19, 1997) (prelim. negative determination) (assistance limited to "remote regions" of Chile); Certain Welded Carbon Steel Pipes and Tubes and Welded Carbon Steel Line Pipe from Turkey, 62 Fed. Reg. 16,782, 16,786 (Dep't Commerce April 8, 1997) (prelim. results) (assistance limited to "normal regions"); Live Swine from Canada, 61 Fed. Reg. 52,426, 52,433-34 (Dep't Commerce Oct. 7, 1996) (prelim. review) (assistance limited to Quebec).

No. 220 at 5-7; Pub. Doc. No. 221 at 6-8. AL Tech and the Government highlight Commerce's finding that ESF Objective 4 funds are not available where ESF Objective 1 funds are already available. However, record evidence suggests that limitation is based on a hierarchy of Italian ESF Objectives; in other words, Objective 4 funds are not used where ESF Objective 1 projects are in place. That differs from a designated geographical limitation. Thus, for example, if there are no ESF Objective 1 projects in southern Italy, Italian ESF Objective 4 funds are available. In contrast, a designated geographical limitation on ESF Objective 4 funding would exclude ESF Objective 4 funds from southern Italy, even if there were no ESF Objective 1 projects there.

Moreover, contrary to Commerce's determination, the record suggests that ESF Objective 4 in fact is not excluded from southern Italy. As Commerce itself determined in the course of its verification of the Government of Italy, "the goals of Objective . . . 4 [are] also implemented [where Objective 1 projects are in place,] but with Objective 1 money."[66] Pub. Doc. No. 220 at 5; *see also* Pub. Doc. No. 221 at 7. In other words, record evidence suggests that the *benefits* provided pursuant to ESF Objective 4 goals are available throughout Italy – even where Objective 1 projects are in place – including southern Italy.

Commerce's specificity finding in this case is also difficult to square with the policy underlying the specificity statute. The purpose of the specificity provision is to distinguish between subsidies that provide generally available benefits to society (which have little trade distorting effect) from those subsidies that are aimed at specific companies, industries or sectors, and thus distort

---

[66]This fact would seem to undermine Commerce's finding that there is "no transferability between the objectives." Final Determination, 63 Fed. Reg. at 40,487. The use of ESF Objective 1 funds to fulfill ESF Objective 4 goals would arguably constitute, in effect, a "transfer" of funds from ESF Objective 1 to ESF Objective 4.

trade significantly. *See generally* John Jackson, <u>The World Trading System: Law and Policy of International Economic Relations</u>, at 296-97 (2nd ed. 1998). *Cf.* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 913 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4230 ("Consistent with longstanding U.S. practice, government assistance that is both generally available and widely and evenly distributed throughout the jurisdiction of the subsidizing authority is not an actionable subsidy."). Thus, a country should be able to confer a generally available benefit "without running the risk that such a benefit will be countervailable . . . ." <u>Inland Steel Indus. v. United States</u>, 188 F.3d 1349, 1355 (Fed. Cir. 1999).

Accordingly, if –  as the record here appears to suggest –  ESF Objective 4 goals are implemented throughout Italy, then countervailing the benefits received under those programs would be unlawful. While funding may be, for administrative purposes, jurisdictionally segregated, policy initiatives that are broadly available should not be countervailed. The agency's duty is to countervail trade-distorting subsidy practices, not multi-jurisdictional budgetary practices.

This issue too is therefore remanded, so that Commerce may reconsider and fully explain its rationale on the specificity of Italian funding, analyzing, *inter alia*, whether ESF Objective 4 goals are implemented throughout Italy and whether ESF Objective 4 is limited to a "designated geographical region" within the meaning of the statute.

### III. <u>Conclusion</u>

For the reasons set forth above, AL Tech's Motion for Judgment on the Agency Record is denied, and Valbruna/Bolzano's Motion for Judgment on the Agency Record is granted. This action

is remanded to the Department of Commerce for further proceedings in accordance with this opinion.[67]

A separate order will enter accordingly.

<u>/s/ Delissa A. Ridgway</u>
Judge

Decided:   September 8, 2004
           New York, New York

---

[67]As indicated in note 7 above, however, a decision on Valbruna/Bolzano's challenge to Commerce's pass-through methodology is expressly reserved. That issue is presently on remand to the agency, and the remand is stayed.